[No. S003129. Dec. 15, 1988.]

COMMERCIAL LIFE INSURANCE COMPANY et al., Petitioners,
v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
JOSEPH V. JULIANO, Real Party in Interest.

**COUNSEL**

Hill, Genson, Even, Crandall & Wade, Edmond D. Wade, Curtis L. Metzgar, Adams, Duque & Hazeltine and David L. Bacon for Petitioners.

Rogers, Joseph, O'Donnell & Quinn, Joseph W. Rogers, Jr., Susan M. Popik, Joe W. Peel, Terri Sorota, Jack H. Blaine and Phillip E. Stano as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Wingert, Grebing, Anello & LaVoy, Michael M. Anello, Thomas O. LaVoy, Robert M. Caietti, Shernoff, Scott & Bidart and Bill Shernoff for Real Party in Interest.

## OPINION

PANELLI, J.—We are asked to decide whether the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1001 et seq.) preempts a private cause of action brought under California Insurance Code section 790.03, subdivision (h),[1] where the action asserts a claim arising from an employee benefit plan. We conclude that ERISA does preempt such an action.

Joseph V. Juliano's employer sponsored an employee benefit plan insured by Commercial Life Insurance Company and Automatic Data Processing, Inc. (collectively referred to as Commercial). It is undisputed that the plan was the type regulated by ERISA. The benefits under the plan included group term life insurance, accidental death and dismemberment insurance, major medical expense benefits, prescription drug and medicine benefits, and dental care benefits.

Juliano suffered from diabetes, which adversely affected his eyesight. Doctors recommended surgery. Following the surgery, Juliano forwarded his medical bills to Commercial. Commercial refused payment, claiming that the treatment was not covered by the plan because it arose from a preexisting condition.

Juliano brought suit against Commercial. The complaint alleged eight common law causes of action for bad faith, waiver, and estoppel. The complaint also alleged a single statutory cause of action for bad faith under section 790.03, subdivision (h).[2] Commercial answered the complaint. Then,

---

[1] Unless otherwise provided, all statutory references are to the Insurance Code.

[2] Section 790.03 provides in pertinent part: "The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance. [¶] . . . (h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices: [¶] (1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue. [¶] (2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies. [¶] (3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies. [¶] (4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured. [¶] (5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear. [¶] (6) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered. [¶] (7) Attempting to settle a claim by an insured for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application. [¶] (8) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the

prior to trial, Commercial filed a motion for judgment on the pleadings, alleging that each cause of action set forth by Juliano was preempted by ERISA. In response, Juliano conceded that *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41 [95 L.Ed.2d 39, 107 S.Ct. 1549] compelled the conclusion that his common law causes of action were preempted by ERISA. However, he argued that his statutory cause of action under section 790.03, subdivision (h), was not preempted. The trial court agreed with Juliano and denied Commercial's motion for judgment on the pleadings as to the statutory cause of action for violation of section 790.03, subdivision (h).

Commercial filed a petition for writ of mandate and/or prohibition in the Court of Appeal. The Court of Appeal summarily denied the petition. We granted review and issued an alternative writ.

In his return to the writ, Juliano argues that section 790.03, subdivision (h) is exempt from preemption because it "regulates insurance" within the meaning of ERISA's "saving clause."

I

ERISA comprehensively regulates employee pension and welfare plans. (*Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 732 [85 L.Ed.2d 728, 735-736, 105 S.Ct. 2380]; 29 U.S.C. §§ 1003, 1002.) The act protects interstate commerce and the participants of employee benefit plans by requiring disclosure to participants, establishing standards of conduct and fiduciary duties, and providing for remedies, sanctions, and ready access to federal courts. (29 U.S.C. § 1001(b).) While ERISA imposes upon benefit plans a variety of substantive requirements relating to participation,

---

insured, his representative, agent, or broker. [¶] (9) Failing, after payment of a claim, to inform insureds or beneficiaries, upon request by them, of the coverage under which payment has been made. [¶] (10) Making known to insureds or claimants a practice of the insurer of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration. [¶] (11) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information. [¶] (12) Failing to settle claims promptly, where liability has become apparent, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage. [¶] (13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement. [¶] (14) Directly advising a claimant not to obtain the services of an attorney. [¶] (15) Misleading a claimant as to the applicable statute of limitations."

In *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], we held that private litigants could sue to enforce certain provisions of section 790.03, subdivision (h). However, *Royal Globe* was prospectively overruled in *Moradi-Shalal* v. *Fireman's Fund Ins. Cos.* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58].

funding, and vesting, it contains almost no federal regulation of the substantive terms of benefit plans. (*Metropolitan Life, supra,* 471 U.S. at p. 732 [85 L.Ed.2d at pp. 735-736].)

ERISA's civil remedies are comprehensive in their scope. A participant or beneficiary of an ERISA plan may bring a civil action for monetary relief from an administrator's failure to provide requested information, or to recover benefits or enforce present or future rights under the terms of the plan. (29 U.S.C. § 1132(a).) Moreover, a participant, beneficiary, or fiduciary may sue to enjoin any act which violates ERISA or the terms of the plan, and may also sue for other equitable relief, or for breach of fiduciary duty. (*Ibid.*) The Secretary of Labor may also bring an action for breach of fiduciary duty, for injunctive or equitable relief, for relief from failure of the administrator to provide information, or to collect any civil penalties under the act. (*Ibid.*)

In addition, ERISA contains detailed provisions for claims enforcement and procedure. (29 U.S.C. §§ 1132, 1133.) Moreover, regulations promulgated by the Department of Labor pursuant to 29 United States Code section 1133 provide specific claims-handling rules and procedures. (29 C.F.R. § 2560.502-1 et seq.)

ERISA also contains a broad preemption provision. The "preemption clause" provides: "Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975." (29 U.S.C. § 1144(a).) The breadth of the preemption clause is qualified, however, by the "saving clause," which provides in pertinent part: "[N]othing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." (29 U.S.C. § 1144(b)(2)(A).)

## II

Our resolution of this case is aided by previous decisions of the United States Supreme Court. In *Metropolitan Life Ins. Co.* v. *Massachusetts, supra,* 471 U.S. 724, the Supreme Court addressed the question whether ERISA preempted a Massachusetts statute which required certain minimum mental-health-care benefits to be included in employee health-care plans. The Massachusetts statute regulated the substantive terms of insurance contracts by requiring health insurance policies to provide, among other things,

60 days of coverage for confinement in a mental hospital and certain minimum outpatient benefits.

Noting that there is a presumption against preemption (*Metropolitan Life, supra,* 471 U.S. at p. 741 [85 L.Ed.2d at p. 741]), the court concluded that the Massachusetts statute was saved from preemption because it regulated insurance within the meaning of ERISA's saving clause.

The court applied the following analysis to determine whether the Massachusetts statute regulated insurance. Initially, the court took a "common sense" view of the matter, concluding that the Massachusetts statute regulated insurance because it controlled the substantive terms of insurance policies. (*Metropolitan Life, supra,* 471 U.S. at p. 740 [85 L.Ed.2d at p. 741].)

Next, the court applied three criteria adopted by case law to define the "business of insurance" under the McCarran-Ferguson Act (15 U.S.C. § 1011 et seq.):[3] " '*first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.' " (*Metropolitan Life, supra,* 471 U.S. at p. 743 [85 L.Ed.2d at p. 742], quoting *Union Labor Life Ins. Co.* v. *Pireno* (1982) 458 U.S. 119, 129 [73 L.Ed.2d 647, 656, 102 S.Ct. 3002], original italics.)

The United States Supreme Court found that all three McCarran-Ferguson factors were satisfied. Addressing the first factor, the court held that the Massachusetts statute "obviously" effected the spreading of risk, because the statute "was intended to effectuate the legislative judgment that the risk of mental-health care should be shared." (*Metropolitan Life, supra,* 471 U.S. at p. 743 [85 L.Ed.2d at p. 742].) Turning to the second factor, the court held that "mandated-benefit laws directly regulate an integral part of the relationship between the insurer and the policyholder by limiting the type of insurance that an insurer may sell to the policyholder." (*Ibid.*) The third factor was also met, because the Massachusetts statute imposed requirements only on insurers. (*Ibid.*)

The Supreme Court had a further opportunity to determine the scope of ERISA preemption in *Pilot Life Ins. Co.* v. *Dedeaux, supra,* 481 U.S. 41 [95

---

[3] The McCarran-Ferguson Act pertains to the regulation of insurance. Section 1011 provides: "*Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.*"

L.Ed.2d 39, 107 S.Ct. 1549]. *Pilot Life* presented the issue whether ERISA preempted common law tort and contract actions arising from the improper processing of a claim for benefits under an insured employee benefit plan. Everate Dedeaux injured his back while working for Entex, Inc. Dedeaux sought disability benefits under an employee benefit plan insured by Pilot Life Insurance Company (Pilot Life). Pilot Life terminated Dedeaux's benefits after two years, and Dedeaux brought a diversity suit in federal district court. Dedeaux alleged Mississippi common law claims for fraud, breach of fiduciary duty, and breach of contract. However, he did not assert any of the causes of action available to him under ERISA. Pilot Life moved for summary judgment, arguing that ERISA preempted all of Dedeaux's claims. The district court granted summary judgment, but the circuit court of appeals reversed.

The Supreme Court reversed the court of appeals. Stating that "the express pre-emption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern'" (*Pilot Life, supra,* 481 U.S. at pp. 45-46 [95 L.Ed.2d at p. 46, 107 S.Ct. at p. 1552]), the Supreme Court concluded that Dedeaux's claims were preempted. Although the Supreme Court applied the *Metropolitan Life* analysis to support its conclusion, it relied primarily on the "clear expression of congressional intent that ERISA's civil enforcement scheme be exclusive" to find preemption. (*Id.* at p. 57 [95 L.Ed.2d at p. 54, 107 S.Ct. at p. 1558].)

Proceeding first with the *Metropolitan Life* analysis, the court applied the "common-sense view" to find that the Mississippi common law of bad faith could not be construed as a law that regulated insurance within the meaning of the saving clause. "A common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but be specifically directed toward that industry." (*Pilot Life, supra,* 481 U.S. at p. 50 [95 L.Ed.2d at p. 49, 107 S.Ct. at p. 1554].)

The court next applied the McCarran-Ferguson factors. Regarding the first factor—whether the practice has the effect of spreading policyholder risk—the court determined, without explanation, that unlike the mandated-benefits law in *Metropolitan Life,* the Mississippi common law did not effect a spreading of policyholder risk. (*Pilot Life, supra,* 481 U.S. at p. 50 [95 L.Ed.2d at p. 49, 107 S.Ct. at p. 1554].) Addressing the second factor—whether the practice is an integral part of the policy relationship between the insurer and the insured —the court stated that the Mississippi common law could perhaps be considered a part of the insurer-insured relationship, but that the connection was attenuated at best. "In contrast to the

mandated-benefits law in *Metropolitan Life,* the common law of bad faith does not define the terms of the relationship between the insurer and the insured; it declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain punitive damages." (*Pilot Life, supra,* 481 U.S. at p. 51 [95 L.Ed.2d at p. 50, 107 S.Ct. at p. 1555].) Thus, although the common law could be considered a "part" of the insurer-insured relationship, it could not be considered an "integral" part. (*Ibid.*) Finally, applying the third factor—whether the practice is limited to entities within the insurance industry—the court noted that the common law had general application to all members of the community, and was not directed solely to the insurance industry. (*Ibid.*) The court concluded that the Mississippi common law failed the McCarran-Ferguson test. (*Id.* at p. 51 [95 L.Ed.2d at p. 50, 107 S.Ct. at pp. 1554-1555].)

The court easily distinguished its *Pilot Life* holding from the holding in *Metropolitan Life.* (*Pilot Life, supra,* 481 U.S. at p. 57 [95 L.Ed.2d at p. 54, 107 S.Ct. at p. 1558].) *Metropolitan Life* did not involve a state law that conflicted with a substantive provision of ERISA, because ERISA—unlike the Massachusetts law in *Metropolitan Life*—"does not regulate the substantive content of welfare-benefit plans." (*Metropolitan Life, supra,* 471 U.S. at p. 732 [85 L.Ed.2d at p. 735].) However, in *Pilot Life* the common law remedies asserted by Dedeaux conflicted with ERISA's remedies. Therefore, the court in *Pilot Life* went on to determine whether Congress intended the ERISA remedies to be exclusive.

The Supreme Court concluded that Congress clearly expressed an intent that the civil enforcement provisions of ERISA be the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits. (*Pilot Life, supra,* 481 U.S. at pp. 51-52 [95 L.Ed.2d at p. 50, 107 S.Ct. at p. 1555].) The court's determination of exclusivity is supported by the language and structure of ERISA's civil enforcement provisions and by the legislative history of the act.[4] (*Ibid.*) "In sum, the detailed provisions of § 502(a) [of ERISA (29 U.S.C. § 1132)] set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and

---

[4]The legislative history indicates that Congress intended ERISA to have the same preemptive force as the exclusive remedy provisions of section 301 of the Labor-Management Relations Act (LMRA) (61 Stat. 156, 29 U.S.C. § 185). (*Pilot Life, supra,* 481 U.S. at pp. 52-56 [95 L.Ed.2d at pp. 51, 52-53, 107 S.Ct. at pp. 1555, 1557-1558].) The Supreme Court stated that the powerful preemptive force of the LMRA displaced all state actions within its scope. (*Id.* at p. 55 [95 L.Ed.2d at p. 53, 107 S.Ct. at p. 1557].)

the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." The court added: "The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive." (*Pilot Life, supra,* 481 U.S. at p. 54 [95 L.Ed.2d at p. 52, 107 S.Ct. at pp. 1556-1557].)

*Metropolitan Life* and *Pilot Life* provide helpful guidance in this case, but the Supreme Court has not addressed the precise issue posed here. A number of other courts, however, have faced this issue.

*Roberson* v. *Equitable Life Assur. Soc. of U.S.* (C.D.Cal. 1987) 661 F.Supp. 416 involved facts almost identical to those at bar. Plaintiff Donald Roberson brought an action in state court against The Equitable Life Assurance Society of the United States (Equitable), alleging that Equitable failed to pay all benefits due under an ERISA-regulated employee benefit plan. Roberson's complaint stated seven common law causes of action. The complaint also stated a single statutory cause of action under section 790.03, subdivision (h), and a single cause of action against his employer, Alpha Microsystems, for ERISA remedies. The defendants removed the case to federal court and moved for summary judgment in light of *Pilot Life*. Roberson conceded that all of his common law claims were preempted by ERISA, but argued that his statutory claim under section 790.03, subdivision (h) was not preempted because section 790.03, subdivision (h) regulates insurance within the meaning of ERISA's saving clause.

The district court applied the analysis set forth in *Metropolitan Life* and *Pilot Life*. The court initially concluded that "common sense" suggested that section 790.03, subdivision (h) regulates insurance. "The most persuasive argument in support of saving the California statute is its obvious connection to regulating insurance. Thus, under the 'common sense' test, it would strain logic to argue that section 790.03(h) is not specifically directed toward the insurance industry." (*Roberson, supra,* 661 F.Supp. at p. 422.)

The court determined, however, that section 790.03, subdivision (h) did not satisfy two of the three McCarran-Ferguson criteria. "First, it would not appear that 790.03(h) has any effect of transferring or spreading policyholder risk. Unlike the Massachusetts law in *Metropolitan Life,* section 790.03(h) does not purport to regulate the substantive terms or content of insurance policies by mandating benefits. Rather, subsection (h) of section 790.03 primarily is aimed at the procedural aspect of processing and settling claims." (*Roberson, supra,* 661 F.Supp. at p. 422.) Turning to the second

McCarran-Ferguson factor, the court stated: "Despite its providing for more specific standards of conduct in processing claims for benefits, section 790.03(h) is not 'integral' to the insurer-insured relationship. Section 790.03(h) does not regulate the terms of the contract itself and hence does not regulate 'the business of insurance' as that term is defined under the McCarran-Ferguson Act." (*Ibid.*) The court determined that section 790.03, subdivision (h) is directed toward the insurance industry, and therefore the third McCarran-Ferguson factor was satisfied. But the court cited authority for the proposition that the satisfaction of only one factor is insufficient. (*Ibid.*, citing *United Food & Commercial Workers* v. *Pacyga* (9th Cir. 1986) 801 F.2d 1157, 1161.)

Finally, the court in *Roberson* followed *Pilot Life's* holding that ERISA's remedies are exclusive. In *Pilot Life,* "because the civil enforcement provisions of ERISA were intended to provide the exclusive remedies for mishandling of claims, the Mississippi law was in conflict with ERISA and was therefore pre-empted. [¶] The same potential for conflict with ERISA's civil enforcement provisions exists with respect to California Insurance Code Section 790.03(h). . . . Section 790.03(h) . . . provides that either an insured *or* third-party claimant may sue an insurer for engaging in unfair claims settlement practices . . . . Such provisions reach impermissibly beyond the scope of ERISA. *See, e.g.* [*Massachusetts Mut. Life Ins. Co.* v. *Russell* (1985) 473 U.S. 134, 145-148] (holding that ERISA does not grant a private right of action for delay in processing benefit claims)." (*Roberson, supra,* 661 F.Supp. at p. 423, original italics.) The court concluded: "Thus, even assuming that section 790.03(h) regulates insurance and is therefore within the scope of the saving clause, it must be pre-empted for infringing on the same exclusive civil remedy provisions that were dispositive in *Pilot Life.*" (*Roberson, supra,* 661 F.Supp. at p. 424, fn. omitted.)

In *Kanne* v. *Connecticut General Life Ins. Co.* (9th Cir. 1988) 859 F.2d 96, the Ninth Circuit Court of Appeals began where *Roberson* left off: It found the conclusion inescapable that section 790.03, subdivision (h) is preempted under *Pilot Life.* Although the Ninth Circuit stated its general agreement with the *Roberson* opinion (*id.* at p. 100, fn. 6), it was willing to assume for purposes of its analysis that section "790.03(h) is a law regulating insurance under the savings clause." (*Id.* at p. 100.)

The *Kanne* court rejected the plaintiffs' argument for limiting *Pilot Life's* preemption holding to only those state laws which do not fall within the savings clause: "To accept this argument, . . . we would have to ignore the second half of *Pilot Life,* 107 S.Ct. 1555-58, in which the Court made abundantly clear that its preemption holding was equally based on its acceptance of the Solicitor General's view that 'Congress clearly expressed an

intent that the civil enforcement provisions of ERISA § 502(a) be the exclusive vehicle for actions asserting improper processing of a claim for benefits.'" (859 F.2d at p. 100.) The court concluded that it was not possible to read the *Pilot Life* discussion of congressional intent as permitting a state statute like section 790.03, subdivision (h) to supplement the ERISA civil enforcement provisions available to remedy improper claims processing. (859 F.2d at p. 100.)[5]

## III

■ Our reading of *Pilot Life* accords with that of the Ninth Circuit in *Kanne.* We are persuaded that section 790.03, subdivision (h) would still be preempted by ERISA even if it were found to be within the scope of the savings clause as a law regulating insurance. This conclusion is compelled by the Supreme Court's discussion of congressional intent, which the court cited as the most significant factor in its determination. (See *Pilot Life Ins.* v. *Dedeaux, supra,* 481 U.S. at p. 57 [95 L.Ed.2d at p. 54, 107 S.Ct. at p. 1558].)

In *Pilot Life,* the Supreme Court held that Congress intended the remedies set forth in ERISA to be the *exclusive* remedies available to ERISA-plan claimants. (*Pilot Life, supra,* 481 U.S. at pp. 50-56 [95 L.Ed.2d at pp. 50-53, 107 S.Ct. at pp. 1555-1557].) However, section 790.03, subdivision (h), as had been interpreted by our decision in *Royal Globe, supra,* 23 Cal.3d 880, provided a private litigant with a cause of action for bad faith settlement practices. (See part IV, *post,* p. 484.) This remedy is not available under ERISA. (Cf. *Massachusetts Mut. Life Ins. Co.* v. *Russell, supra,* 473 U.S. at pp. 145-148 [87 L.Ed.2d at pp. 105-107] [private right of action for extracontractual damages is neither expressly nor impliedly available under 29 U.S.C. § 1109(a)].) Therefore, the remedy available to a private litigant

---

[5] Other cases have also found preemption. *Lee* v. *Prudential Ins. Co. of America* (N.D.Cal. 1987) 673 F.Supp. 998 held that although section 790.03, subdivision (h) *does* regulate insurance under the common sense and McCarran-Ferguson analyses, the statute is nevertheless preempted because ERISA's remedies are exclusive. *Misic* v. *Building Service Employees Health* (9th Cir. 1986) 789 F.2d 1374 affirmed the dismissal of the plaintiff's state law claims, including a claim under section 790.03, subdivision (h), based on ERISA preemption. *Russell* v. *Mass. Mut. Life Ins. Co.* (9th Cir. 1983) 722 F.2d 482, reversed on other grounds in *Massachusetts Mut. Life Ins. Co.* v. *Russell, supra,* 473 U.S. 134, held that the plaintiff's state law claims, including section 790.03, subdivision (h) are preempted by ERISA.

Although some federal courts have determined that section 790.03, subdivision (h) is not preempted by ERISA, those cases were decided prior to *Metropolitan Life* and *Pilot Life* and did not have the benefit of the Supreme Court's guidance on the issue. (See *Eversole* v. *Metropolitan Life Ins. Co., Inc.* (C.D.Cal. 1980) 500 F.Supp. 1162; *Presti* v. *Connecticut General Life Ins. Co., Inc.* (N.D.Cal. 1985) 605 F.Supp. 163.)

We are aware that other decisions have been rendered on both sides of the issue presented. Because those decisions are unpublished, they are not discussed here.

under section 790.03, subdivision (h), conflicts with ERISA's exclusive remedies. This type of conflict was expressly disallowed in *Pilot Life*. (*Pilot Life, supra,* 481 U.S. at pp. 50-57 [95 L.Ed.2d at pp. 50-54, 107 S.Ct. at pp. 1555-1558].) Moreover, in *Pilot Life* the Supreme Court held that Congress's omission of certain remedies was intentional: "The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA. 'The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted . . . provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" (*Pilot Life, supra,* 481 U.S. at p. 54 [95 L.Ed.2d at p. 52, 107 S.Ct. at p. 1556], quoting *Massachusetts Mut. Life Ins. Co.* v. *Russell, supra,* 473 U.S. at p. 146 [87 L.Ed.2d at p. 106], italics in original.) We conclude that *Pilot Life's* express holding controls the resolution of this case.[6] *Pilot Life* is directly on point regarding the exclusivity issue, and its conclusion is inescapable.

We find no merit in the argument that if there is any conflict between ERISA remedies and section 790.03, subdivision (h) remedies, such conflict was created by Congress when it enacted ERISA's preemption clause and saving clause. The argument asserts that the saving clause allows states to regulate insurance and hence to enact conflicting remedies. ■ However, while the saving clause may allow states to enact statutes that regulate the *substantive* terms of insurance policies (see *Metropolitan Life, supra,* 471 U.S. at pp. 740-744 [85 L.Ed.2d at pp. 740-743]), the clause does not allow states to enact statutes that provide conflicting *procedural* remedies (see *Pilot Life, supra,* 481 U.S. at pp. 50-57 [95 L.Ed.2d at pp. 50-54, 107 S.Ct. at pp. 1555-1558]). A contrary rule would undermine ERISA's important policy of promoting uniformity in employee benefit-plan remedies, by creating the potential for conflicting standards of recovery. (*Powell* v. *Chesapeake & Potomac Telephone Co. of Va.* (4th Cir. 1985) 780 F.2d 419, 422.)

## IV

■ We conclude that ERISA preempts private causes of action under section 790.03, subdivision (h).[7] Of course, our recent decision in *Moradi-Shalal* v. *Fireman's Fund Ins. Cos., supra,* 46 Cal.3d 287, prospectively

---

[6] In *Pilot Life,* the Supreme Court stated that its analysis regarding the exclusivity of remedies was the most important factor in its determination of preemption. (*Pilot Life, supra,* 481 U.S. at p. 57 [95 L.Ed.2d at p. 54, 107 S.Ct. at p. 1558].)

[7] We do not decide whether ERISA preempts an action by the Insurance Commissioner to enforce the provisions of the Unfair Practices Act (§ 790 et seq.) where such enforcement pertains to a dispute involving an ERISA benefit plan.

eliminates private causes of action under section 790.03, subdivision (h). Accordingly, our holding of preemption in this case is applicable only to cases which survive *Moradi-Shalal.*

Although our decision in this case prevents Juliano from stating a cause of action for breach of statutory duties under section 790.03, subdivision (h), he nevertheless may amend his complaint to state a claim for ERISA remedies. (See 29 U.S.C. § 1132(e)(1) ["State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section"].)

Let a peremptory writ of mandate issue directing the Superior Court of San Diego County to vacate its order denying defendants' motion for judgment on the pleadings as to plaintiff's fifth count for breach of statutory duties under section 790.03, subdivision (h), and to enter a new order consistent with this opinion.

Lucas, C. J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I dissent. I strongly disagree not only with the majority's result but also with their reasoning.

## I.

With due deference to the United States Supreme Court, I doubt that it gives the bench and bar helpful guidance when it relies on "common sense" as authority for a decision. Nevertheless the high court has done so in *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41 [95 L.Ed.2d 39, 107 S.Ct. 1549] and the majority herein hold that conclusion to be controlling.

In *Pilot Life,* the court finds a "broad common-sense meaning" (*id.* at p. 47 [95 L.Ed.2d at p. 48, 107 S.Ct. at p. 1553]), a "common-sense view" (*ibid.*), "a common-sense understanding" (*id.* at p. 50 [95 L.Ed.2d at p. 49, 107 S.Ct. at p. 1554]), a "common-sense view" (*ibid.*) and the opinion concludes with a "common-sense understanding" (*id.* at p. 57 [95 L.Ed.2d at p. 54, 107 S.Ct. at p. 1558]).

In reliance on *Pilot Life,* the majority seem to assume that there is some pandemic "common sense" that can guide us in the place of reason and authority. It would indeed be comforting if that were so. But unfortunately it is not: "common sense" is in the eye, or mind, of the beholder.

United States Supreme Court cases have used the term "common sense" in a wide variety of contexts. Indeed, a cursory count indicates the expression can be found in more than 500 cases over the past 4 decades alone.

For example, the high court has used "common sense" and "subjective" as synonyms. (See, e.g., *United States* v. *Maine* (1985) 469 U.S. 504, 525 [83 L.Ed.2d 998, 1014].) In other cases, it has equated "common sense" with probability. (E.g., *Basic Inc.* v. *Levinson* (1988) 485 U.S. 224, 246-247 [99 L.Ed.2d 194, 218, 108 S.Ct. 978, 991].) Justice Cardozo wrote of "common-sense accommodation" in *Gully* v. *First National Bank* (1936) 299 U.S. 109, 117 [81 L.Ed. 70, 75, 57 S.Ct. 96], and in *Monessen Southwestern Ry. Co.* v. *Morgan* (1988) 486 U.S. 330, __ [100 L.Ed.2d 349, 369, 108 S.Ct. 1837, 1852], reference is made to "common experience or common sense." *Mills* v. *Maryland* (1988) 486 U.S. 367, __ [100 L.Ed.2d 384, 406, 108 S.Ct. 1860, 1875], discusses "a common-sense core of meaning." *United States* v. *Providence Journal Co.* (1988) 485 U.S. 693, __ [99 L.Ed.2d 785, 805, 108 S.Ct. 1502, 1514], discerns a "common sense reading" of a statute, as does *Boos* v. *Barry* (1988) 485 U.S. 312, __ [99 L.Ed.2d 333, 343, 108 S.Ct. 1157, 1162]. *Honig* v. *Doe* (1988) 484 U.S. 305, 323-324 [98 L.Ed.2d 686, 706-707, 108 S.Ct. 592, 604], relies on a "common sense proposition." *Carnegie-Mellon University* v. *Cohill* (1988) 484 U.S. 343, 355-356 [98 L.Ed.2d 720, 733, 108 S.Ct. 614, 622], holds a proposition is "confirmed by common sense," and *United Paperworkers Intern. Union* v. *MISCO, Inc.* (1987) 484 U.S. 29, 44 [98 L.Ed.2d 286, 302-303, 108 S.Ct. 364, 374], concludes a judgment is "firmly rooted in common sense." For the ultimate, the court in *Norwest Bank Worthington* v. *Ahlers* (1988) 485 U.S. 197, 209 [99 L.Ed.2d 169, 181, 108 S.Ct. 963, 970], found "great common sense." How we are to distinguish between "common sense" and "great common sense" is perplexing.

As a review of the foregoing cases and others like them establishes beyond any dispute, "common sense" is a convenient term. But it is also practically devoid of content.

For instance, in attempting to justify the holding of the court in *Peak* v. *United States* (1957) 353 U.S. 43 [1 L.Ed.2d 631, 77 S.Ct. 613], on behalf of the majority Justice Douglas stated, "That seems to us to be the common sense of the matter; and common sense often makes good law." (*Id*. at p. 46 [1 L.Ed.2d at p. 635].) But Justice Harlan, writing for himself and two others in dissent, drily observed, "Thus is bad law made." (*Id*. at p. 52 [1 L.Ed.2d at p. 638] [dis. opn. of Harlan, J.].) Can it be said that by disagreeing with the majority on a point of law Justice Harlan and his colleagues were guilty of not using "common sense"? I think not.

In *Roschen* v. *Ward* (1929) 279 U.S. 337, 339 [73 L.Ed.722, 728, 49 S.Ct. 336], Justice Holmes declared, "there is no canon against using common sense in construing laws as saying what they obviously mean." Sounds simple. But as Justice Story noted in *Barlow* v. *United States* (1833) 7 Pet. (32 U.S.) 404, 411 [8 L.Ed. 728, 731], "There is scarcely any law which does

not admit of some ingenious doubt." Are the doubters necessarily declining to use "common sense"? I think not.

In *The Kronprinzessin Cecilie* (1917) 244 U.S. 12, Justice Holmes referred to what is apparently a specialized form of "common sense": "Business contracts must be construed with business sense . . . ." (*Id*. at p. 24 [61 L.Ed. at p. 966].) Apparently that did not satisfy the entire court, for Justices Pitney and Clarke dissented. What kind of sense they preferred was not indicated.

Members of the high court have not been altogether unmindful of the problems associated with "common sense." In *Jacksonville Bulk Terminals, Inc.* v. *International Longshoremen's Association* (1982) 457 U.S. 702 [73 L.Ed.2d 327, 102 S.Ct. 2672], one of the parties argued that a "common sense" interpretation of a statute should be applied. Said Chief Justice Burger in dissent, "the 'common sense' meaning of a term is not controlling when Congress has provided . . . an explicit definition of a labor dispute. 'Common sense' and legislative history ought not to change the meaning of unambiguous words of a statute." (*Id*. at p. 727 [73 L.Ed.2d at p. 346] [dis. opn. of Burger, C. J.].)

In *In re Primus* (1978) 436 U.S. 412 [56 L.Ed.2d 417, 98 S.Ct. 1893], then Justice Rehnquist wrote in dissent that the majority's "common-sense, distinction [between speech proposing a commercial transaction and other varieties of speech] is subject to manipulation by clever practitioners." (*Id*. at pp. 441-442 [56 L.Ed.2d at p. 441] [dis. opn. of Rehnquist, J.].)

In short, I believe that the implied invocation of "common sense" as authority for an opinion of this court is insufficient and as such cannot be helpful to the parties in this case or to the bench and bar in future matters. As Justice Rehnquist explained, the term is "subject to manipulation" and therefore lacks substance.

## II.

Real party in interest Joseph V. Juliano (hereinafter Juliano) brought the underlying action for damages against petitioners Commercial Life Insurance Company and Automatic Data Processing, Inc. (hereinafter collectively Commercial Life). In his complaint Juliano alleged in substance that Commercial Life had issued a policy of insurance, sponsored by his employer, establishing an employee welfare benefit plan that provided group term life insurance, accidental death and dismemberment insurance, and benefits

for major medical expenses, prescription drugs and medicines, and dental care; he was entitled to benefits for treatment of diabetic retinopathy and was so informed by Commercial Life; he received treatment including ophthalmic surgery; at first, Commercial Life paid a small portion of his medical bills, but then wrongfully refused to pay the rest. Juliano asserted, among other causes of action, a claim that Commercial Life had violated its statutory duties under the Unfair Trade Practices Act (Ins. Code, § 790 et seq.), specifically, Insurance Code section 790.03, subdivision (h) (hereinafter section 790.03(h)).

The majority hold that the Employee Retirement Income Security Act of 1974 (hereinafter ERISA) (88 Stats. 829, as amended, 29 U.S.C. § 1001 et seq.) preempts section 790.03(h) as relevant here and thereby bars Juliano's claim under that provision. As will appear, they are wrong.

ERISA regulates, among other matters, "employee welfare benefit plans" that, "through the purchase of insurance or otherwise," provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death, or unemployment . . . ." (ERISA § 3(1), 29 U.S.C. § 1002(1).) Within its sphere, ERISA purports to preempt state law. The act states in a preemption clause that its provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." (ERISA § 514(a), 29 U.S.C. § 1144(a).) ERISA, however, may not and does not preempt state law in its entirety. As relevant here, the act declares in a saving clause that "nothing in this [statute] shall be construed to exempt or relieve any person from any law of any State which regulates insurance . . . ." (ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A).)

It is plain that ERISA regulates the plan in which Juliano participated. As stated above, Juliano's employer sponsored a plan providing a variety of insurance coverage and other benefits for its employees.

It is also plain that section 790.03(h) comes within the class of state laws that ERISA purports to preempt. The provision "relate[s] to . . . employee benefit plan[s]" (ERISA § 514(a), 29 U.S.C. § 1144(a)) by defining "unfair claims settlement practices" (§ 790.03(h)).

But it is plainer still that section 790.03(h) is saved from preemption by the express terms of ERISA: the provision clearly "regulates insurance" (ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A)). As I read their opinion, the majority do not seriously dispute that section 790.03(h) comes within ERISA's saving clause—nor could they (see *Lee* v. *Prudential Ins. Co. of America* (N.D.Cal. 1987) 673 F.Supp. 998, 1000-1001).

In spite of the foregoing, the majority hold that section 790.03(h) is not saved from preemption and hence that Juliano's claim under the statutory provision is barred. In support they assert that ERISA has established a civil enforcement scheme that provides exclusive remedies. That may be true. But ERISA's scheme defines remedies *for the violation of rights granted employees under the terms of plans within the coverage of the act and under the act itself.* (See ERISA § 502(a), 29 U.S.C. § 1132(a).)[1] By contrast, the Unfair Trade Practices Act, of which section 790.03(h) is a part, has established a civil enforcement scheme that provides remedies *for the breach of duties imposed on insurers under the laws of the State of California.* In a word, the remedies of ERISA may be exclusive in their own sphere, but they do not extend into the sphere occupied by section 790.03(h). (Cf. *Mackey* v. *Lanier Collections Agency & Service* (1988) 486 U.S. 825, __-__ [100 L.Ed.2d 836, 844-851, 108 S.Ct. 2182, 2185-2191] [ERISA does not bar a state garnishment action against a covered employee welfare benefit plan: the federal act does not provide an enforcement mechanism for collecting judgments against covered plans and hence does not preempt state law in that area].)

Thus, ERISA does not preempt section 790.03(h), but expressly saves the provision as a law "regulat[ing] insurance." Further, the civil enforcement scheme of the federal statute does not displace the civil enforcement scheme of the state act: the former concerns the rights of employees under covered plans, the latter concerns the duties of insurers under state laws.

---

[1] Section 502(a) of ERISA, codified at 29 United States Code section 1132(a), provides as follows.

"A civil action may be brought—

"(1) by a participant or beneficiary—

"(A) for the relief provided for in subsection (c) of this section [concerning requests to the administrator for information], or

"(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

"(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title [for breach of fiduciary duty];

"(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

"(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 1025(c) of this title [concerning information to be furnished participants];

"(5) except as otherwise provided in subsection (b) of this section, by the Secretary (A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this subchapter; or

"(6) by the Secretary to collect any civil penalty under subsection (i) of this section [for breach of fiduciary duty]."

### III.

There is a growing and ominous trend toward federal preemption of issues that belong within the sphere of control by the individual states. And these inroads into traditional federalism are taking place despite their inconsistency with pious rhetoric emanating from Washington about returning government to the people at state and local levels.

The first Californian to sit on the United States Supreme Court, Stephen Field, saw the problem clearly as long ago as the period immediately following the Civil War. In *Ex parte Virginia* (1880) 100 U.S. 339, 357 [25 L.Ed. 676, 683], he wrote: "Now, if we look into the Constitution, we shall not find a single word, from its opening to its concluding line, nor in any of the amendments in force before the close of the civil war, nor . . . in those subsequently adopted, which authorizes any interference by Congress with the States in the administration of their governments, and the enforcement of their laws with respect to any matter over which jurisdiction was not surrendered to the United States. The design of its framers was not to destroy the States, but to form a more perfect union between them, and, whilst creating a central government for certain great purposes, to leave to the States in all matters the jurisdiction of which was not surrendered the functions essential to separate and independent existence."

Justice Field took the same position in *Virginia* v. *Rives* (1880) 100 U.S. 313, 337 [25 L.Ed. 667, 676]: "It is difficult to believe that the wise men who sat in the convention which framed the Constitution and advocated its adoption ever contemplated the possibility of a State being required to assert its authority over offenders against its laws in other tribunals than those of its own creation, and least of all in an inferior tribunal of the new government. I do not think I am going too far in asserting that had it been supposed a power so dangerous to the independence of the States, and so calculated to humiliate and degrade them, lurked in any of the provisions of the Constitution, that instrument would never have been adopted."

In the instant case we have a state regulatory statute at issue. In the *Sinking-Fund Cases* (1879) 99 U.S. 700 [25 L.Ed. 496, 25 L.Ed. 504], a state-created corporation was involved. On that subject Justice Field was emphatic: "In a word, the law of the State undertakes to control and manage the corporation, in all particulars required for the service, convenience, and protection of the public; and can there be a doubt in the mind of any one that over its own creations the State has, within its own territory, as against the United States, the superior authority? . . . Under the Constitution the management of local affairs is left chiefly to the States, and it never entered into the conception of its framers that under it the creations of the

States could be taken from their control." (*Id*. at pp. 768-769 [25 L.Ed. at p. 519].)

In our case the law regulating insurance was brought into existence by the state. Under these circumstances it could not have been contemplated, within constitutional limitations, that enforcement of this state creation should pass exclusively to Washington.

## IV.

In conclusion, I would hold that Juliano's section 790.03(h) cause of action is not barred. Accordingly, I dissent.

Broussard, J., concurred.