Edward HOLMES, Sherri Estelle Holmes and Edward Zachory Holmes, Plaintiffs,

v.

PACIFIC MUTUAL LIFE INSURANCE COMPANY, et al., Defendants.

No. CV–SA–88–388–JSL.

United States District Court, C.D. California, Los Angeles Division.

Jan. 18, 1989.

---

Marian H. Tully, Shernoff, Scott & Bidart, Claremont, Cal., for plaintiffs.

Lonnie E. Woolverton, Adams, Duque & Hazeltine, Los Angeles, Cal., for defendants.

## OPINION

LETTS, District Judge.

### FACTS

This case presents novel facts against which to test the scope of ERISA's preemption clause, 29 U.S.C. § 1144(a), of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.

The facts alleged by Plaintiffs, which are accepted as true for the purposes of this decision, are as follows. Plaintiffs' decedent, Dolores Holmes, was an employee of Fountain Valley Hospital. She was also a participant in an employee benefit plan sponsored by the hospital which covered certain medical expenses. Defendant Pacific Mutual Insurance Company was the administrator of the plan, which plan satisfied the definition of an ERISA plan under 29 U.S.C. § 1002(1), and therefore falls within the coverage of the provisions of ERISA.

Sometime during 1987, Holmes developed a life-threatening liver disorder for which a liver transplant was the only prescribed cure. Arrangements were made for the surgery to be performed at the UCLA Medical Center. When Defendant Pacific Mutual was asked by UCLA whether the Fountain Valley Hospital medical plan provided coverage for this surgery, Pacific Mutual erroneously affirmed that it did.

After tentative arrangements for surgery had been made, Holmes was required to wait until a transferrable liver was located. When an appropriate liver became available, UCLA again called to verify that the plan covered the cost of the surgery. This time Pacific Mutual correctly answered that it did not.

Holmes then determined that she had other medical coverage. Arrangements were again made for her surgery to proceed, but before another liver was found, Holmes died.

For purposes of decision, the Court assumes, but does not decide, that (i) Holmes' operation in fact was cancelled because Pacific Mutual denied coverage rather than for some other reason; (ii) if Pacific Mutual had not confirmed coverage initially, other coverage would have been found on a timely basis; (iii) the operation would have gone forward as scheduled with the original liver; (iv) the operation would have been successful; and (v) Holmes would have reached her full life expectancy.[1]

The complaint in this case was filed in Orange County Superior Court. It was removed here based upon federal question jurisdiction under ERISA. Plaintiffs seek remand, urging that no ERISA claim is stated by the complaint. Defendants, on the other hand, move for summary judgment on the ground that ERISA preempts Plaintiffs' state law claims because these claims are based entirely on representations made by Pacific Mutual acting in its capacity as the plan's administrator.

The court now holds that ERISA preempts Plaintiffs' state law causes of action, and that Defendants' motion for summary judgment is granted.

### ANALYSIS

Analysis of this case under ERISA must begin with the language of 29 U.S.C. § 1144(a), the ERISA "preemption clause." This section provides, in relevant part, that ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan."

---

1. As to points (iv) and (v), it appears that under state law serious issues of proximate causation would arise, since Holmes' death undeniably resulted from natural causes, and the alleged negligence did not occur in the course of an attempt to intervene, but only interfered with a proposed attempt to intervene as to which no proof was possible to show that it would have succeeded.

"State laws" include state causes of action which relate to any employee benefit plan. 29 U.S.C. § 1144(c)(1); see also *Jung v. FMC Corp.*, 755 F.2d 708, 714 (9th Cir. 1985).

In order to test the scope of its effect properly, § 1144(a)'s extremely broad language must be construed in the context of the underlying social problems to which ERISA was addressed. When Congress was considering ERISA in the early 1970's, there was great concern over the possibility of widespread termination of employee benefit plans. Because of underfunded pension plans, many employees were faced with losing retirement income for which they had worked for years. In fact, it was becoming increasingly apparent that many long time employers might be unable to meet benefit obligations owed to aging work forces. 29 U.S.C. § 1001(a); see also H.R.Rep. No. 807, 93rd Cong., 2d. Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4670, 4678–9 ("House Report No. 807").

In the depressed economic environment of the time, Congress was concerned that demands upon employee benefit plans would increase dramatically. As a result, more and more employer sponsors might be rendered insolvent and leave employees, who supposedly had "vested" benefits, with nothing. 29 U.S.C. § 1001(a); see also House Report No. 807, 1974 U.S.Code Cong. & Admin.News at 4680; S.Rep. No. 383, 93rd Cong., 2d. Sess. ——, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4890, 4892 ("Senate Report No. 383").[2]

At the same time, Congress was concerned that the Social Security system, itself strained by the increasing demands made on it by retired workers, could not be relied upon to provide adequate retirement benefits for the vast majority of covered employees.

By "tak(ing) into account additional costs from the standpoint of the employer"[3], Congress indicated that one of the prime purposes of ERISA was to encourage the private sector to bear a larger share of the responsibility for establishing and maintaining a consistent employee benefit structure. 29 U.S.C. § 1001a(b)(2). Necessary corollaries of this purpose were that the ERISA structure be as universal as possible and that it provide maximum assurance of payment of promised benefits. 29 U.S. C. § 1001a(b)(2) and (c)(4); *Russell v. Massachusetts Life Insurance Co.*, 722 F.2d 482, 487 (9th Cir.1983), *rev'd on other grounds*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)[4]. In order to ensure payment of plan benefits, ERISA therefore requires that all benefits provided by ERISA plans be currently funded on an actuarially sound basis.[5]

To maintain the desired degree of certainty in payment of plan benefits, it is critical that the actuarial assumptions, upon which the minimum funding calculations are based, be preserved through time. It is for this reason that ERISA preemption, which shields ERISA employee benefit plans from unforeseen liabilities, including liability arising from the acts of the plan administrators, is critical to the entire statutory scheme. Viewed from this per-

---

**2.** Sponsors of ERISA pointed to the Studebaker case as a specific and representative example of these sorts of dangers. In 1964, Studebaker failed and closed its plant in South Bend, Indiana. Inability to meet its employee benefit obligations was cited as one of the prime causes of the failure which not only put many current employees out of work, but deprived all but a narrow segment of employees of "vested" retirement benefits under employee benefit plans.

**3.** House Report No. 807, 1974 U.S.Code Cong. & Admin.News at 4682; see also 120 Cong.Rec. 8702 (Aug. 20, 1974) (statement of Rep. Al Ullman upon introducing the conference report on H.R. 2), *reprinted in* 1974 U.S.Code Cong. & Admin.News at 5166, paragraph 4, line 2.

**4.** The Supreme Court reversed the Ninth Circuit in *Russell* on the grounds that 29 U.S.C. § 1109(a) did not permit a trial court to award extra-contractual damages for the untimely processing of a benefits claim. *See* discussion of *Russell, infra.*

**5.** To effect this purpose, Congress adopted express "minimum funding standards" to insure that plans governed by ERISA "will produce sufficient funds to meet the obligations of the plan when they come due." House Report No. 807, 1974 U.S.Code Cong. & Admin.News at 4690; Senate Report No. 383, 1974 U.S.Code Cong. & Admin.News at 4907.

spective, the issues posed by the facts of this case are not novel by reference to issues already resolved in earlier cases.

The principle that ERISA employee benefit plans must be shielded from liabilities which ultimately would be passed on to ERISA plans by way of indemnification or increased costs is well-settled by case law. In *Wadsworth v. Whaland,* 562 F.2d 70 (1st Cir.1977), *cert. denied,* 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978), the First Circuit noted that Congress intended § 1144(a) to preempt *all* state laws that relate to an ERISA plan—not just those which purport to regulate an area to which ERISA addresses itself. *Wadsworth,* 562 F.2d at 76–7. Thus, even if the state law in question is one of general application and is not designed to affect ERISA plans other than in an indirect manner, the state law is preempted if it is caught within ERISA's "sweep." *Pervel Industries, Inc. v. State of Connecticut Commission on Human Rights and Opportunities,* 468 F.Supp. 490, 492 (D.Conn.1978), *aff'd,* 603 F.2d 214 (2d Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

ERISA itself does not provide for extra-contractual liabilities. *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). This principle is so well settled that it has even been applied so as to preempt state laws which would otherwise impose liability upon insurance company plan administrators for bad faith denial of insurance benefits. *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).[6]

Against this background, ERISA preemption of the claim brought by Plaintiffs must be viewed as an *a fortiori* application of settled case law. To permit a state law cause of action to go forward to recover damages allegedly resulting from an innocent but mistaken affirmation of coverage, followed by a good faith denial, when an action for the same damages resulting from an immediate *bad faith denial* of coverage would be preempted by ERISA, would make no sense at all.

Consequently, the test for ERISA preemption is whether Plaintiffs' state cause of action would violate the ERISA policy of protecting the integrity of the actuarial assumptions upon which the ERISA legislation is based. Such a test is necessary to preserve certainty of payment of plan benefits.

The court notes that, were it not for the decision in *Pilot Life,* it might be argued that ERISA does not require preemption of actions under state law against independent plan administrators since payments of liabilities would not come from the fund nor appear at first blush to disturb such actuarial assumptions for funding. These cases, however, have wisely settled the principle that ERISA requires preemption of actions against plan administrators as well as plans themselves.[7]

The only remaining question—whether ERISA itself might provide a remedy to Plaintiffs—seems settled in favor of Defendants by the holding in *Russell, supra.* To allow such claims, or claims like the one at

---

**6.** Most recently, the California Supreme Court, relying heavily on *Pilot Life,* held that ERISA preempted a state law bad faith denial of benefits claim filed under California Insurance Code § 790.03(h). *Commercial Life Insurance Co. v. Superior Court of San Diego County,* 47 Cal.3d 473, 253 Cal.Rptr. 682, 764 P.2d 1059 (1988). Plaintiff conceded that *Pilot Life* preempted his common law cause of action for bad faith denial of benefits, but maintained that it did not preempt § 790.03(h). The California Supreme Court specifically rejected this line of argument, noting that "a contrary rule would undermine ERISA['s] important policy of promoting uniformity in employee benefit plan remedies." *Commercial Life* 253 Cal.Rptr. at 689, 764 P.2d at 1066.

**7.** Were this not the case, the ultimate cost of the liabilities imposed upon plan administrators inevitably would fall back on employers and the plans they sponsor. For self-administered plans this result would follow automatically. While some independent administrators of large employer plans might attempt to absorb the cost of exposure to liability by increasing fees, it seems likely that most professional administrators would either demand indemnification provisions from smaller employer plans or would simply abstain from the business of administering them.

issue here, to go forward under ERISA would defeat the very purpose for which preemption is provided.