[No. B058371. Second Dist., Div. Three. Sept. 25, 1991.]

AMERICAN INTERNATIONAL GROUP, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
BRUTOCO ENGINEERING & CONSTRUCTION, INC., Real Party in
Interest.

750

**Counsel**

Arter, Hadden, Lawler, Felix & Hall and William S. Davis for Petitioners.

No appearance for Respondent.

Jones, Mahoney & Brayton, Paul M. Mahoney and Richard A. Soll for Real Party in Interest.

OPINION

**CROSKEY, J.**—Petitioners, American International Group, Inc., and American Home Assurance Company, are defendants in an action commenced by respondent Brutoco Engineering & Construction, Inc. (Brutoco). Brutoco seeks damages on a number of legal theories[1], all of which allegedly arise from certain misrepresentations made to it by petitioners with respect to a policy for workers' compensation insurance. The only claim with which we are concerned is the 10th cause of action which was brought under the Racketeer Influenced and Corrupt Organizations Act. (18 U.S.C. §§ 1961-1968 [RICO].)

The question which we address is both novel and narrow. Petitioners ask us to issue a writ of mandate requiring the trial court to vacate an order denying their motion for a judgment on the pleadings with respect to Brutoco's RICO claim. Petitioners assert that such a cause of action is precluded by the operation of the McCarran-Ferguson Act (15 U.S.C. § 1011 et seq.; see fn. 3, *post*) and the laws of the State of California purporting to regulate the business of insurance. We conclude that petitioners are correct and that a civil RICO cause of action cannot be asserted by an insured in California against an insurer for alleged misrepresentations made in the course of the marketing, sale or performance of an insurance policy contract. We therefore grant the writ.

FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a dispute between petitioners and Brutoco which stems from a written contract of insurance issued by petitioners on October 1, 1986. That contract provided for a one-year policy of workers' compensation insurance for Brutoco. Certain provisions in the policy contract related to a premium "endorsement agreement"[2] whereby petitioner agreed

[1]Brutoco's complaint, filed on March 14, 1990, asserted 10 separate causes of action: (1) breach of insurance contract, (2) breach of duty of good faith and fair dealing, (3) breach of fiduciary duty, (4) bad faith breach of contract, (5) intentional misrepresentation, (6) negligent misrepresentation, (7) declaratory relief, (8) professional malpractice, (9) conspiracy and (10) RICO. The record reflects that a judgment on the pleadings has already been granted in favor of the petitioners with respect to the second, third and fourth causes of action.

[2]These provisions are described in Brutoco's complaint as an agreement whereby petitioners would, within six months after termination of the policy, make an audit of Brutoco's

to refund certain premiums to Brutoco depending upon the claims history over a specific period of time.

On March 14, 1990, Brutoco filed a complaint in which it alleged that by virtue of the total premiums which it paid and its relevant claims history it was entitled to a refund of premiums in excess of $200,000. Brutoco sought, by its action, to recover this sum plus other substantial damages including interest, costs and attorney's fees. One of the theories relied upon was a federal statutory cause of action under RICO.

To support that claim Brutoco alleged that petitioners' failure to pay the premium refund to it under the policy was coupled with a fraudulent intent never to pay a refund. Brutoco further alleged that such an intent was part of a fraudulent scheme perpetrated on Brutoco and on other insureds and that mail and wire fraud were used as instrumentalities to communicate or further false representations regarding the intent to pay premium refunds. Based on these allegations, Brutoco asserts that the misrepresentations constituted the required "predicate acts" under RICO.

On February 11, 1991, petitioners filed their answer in which they alleged, inter alia, that Brutoco could not state a cause of action under RICO, as such a claim was barred under the provisions of the McCarran-Ferguson Act, 15 United States Code section 1011 et seq. (McCarran-Ferguson).[3] On March 11, 1991 petitioners filed a motion for judgment on the pleadings with respect to Brutoco's RICO claim, arguing that it was preempted as a matter of law under McCarran-Ferguson.

---

records in order to determine the standard premium and from that the "basic premium"; within eight months after policy termination, petitioners agreed to determine the amount of incurred losses, including an estimate of unpaid losses. From such determination of basic premium and incurred losses petitioners were required to calculate the amount of the "retrospective premium." The difference between the retrospective premium and the premiums actually paid by Brutoco was to be refunded to Brutoco.

[3]The relevant portions of McCarran-Ferguson provide:

"§ 1011. Congress hearby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

"§ 1012.

"(a) *State Regulation.* The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) *Federal Regulation.* No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance. . . ."

On April 1, 1991, the trial court denied the motion after noting that sufficient facts had been alleged to assert a RICO claim against petitioners and that no published case had held that McCarran-Ferguson bars such a claim in those states which have enacted laws purporting to regulate the business of insurance.[4]

Asserting that they have no plain, speedy or adequate remedy at law, petitioners filed a timely petition for a writ of mandate with this court seeking an order directing the trial court to vacate its order of April 1, 1991 and to enter a new and different order granting petitioners' motion. On May 24, 1991, we issued an alternative writ.

## Issue Presented

The dispositive issue before us is whether, in light of California law purporting to regulate the business of insurance, the provisions of McCarran-Ferguson preclude the assertion of a RICO claim based upon an insurer's alleged misrepresentations regarding the terms of a policy of insurance and the insurer's performance thereunder.

## Discussion

### 1. *Standard of Review*

A motion for judgment on the pleadings serves the same basic function as a demurrer. (*April Enterprises, Inc.* v. *KTTV* (1983) 147

[4]Petitioners sought to rely upon *Richart* v. *Metropolitan Life Ins. Co.* (1990 E.D.Pa.) No. 89-1725 (1990 Westlaw 39268), an unpublished decision of a federal district court. The trial court refused to consider this case because of its unpublished status, apparently relying upon California Rules of Court, rule 977(a). The parties engage in considerable debate as to whether this rule has any application to unpublished federal cases, as opposed to California decisions. However, we do not need to reach that issue. We are content to evaluate the relative merits of the issues presented without the assistance of this federal case.

Prior to oral argument, petitioners also provided us with two additional cases which are supportive of their position. The first is *Senich* v. *Transamerica Premier Ins. Co.* (W.D.Pa. 1990) 766 F.Supp. 339, a decision of the United States District Court for the Western District of Pennsylvania filed on September 18, 1990. The second case is from the intermediate appellate court of the State of Pennsylvania, *Leckey* v. *Aetna Casualty and Surety Co.* (1991) 404 Pa. Super. 323 [590 A.2d 1255]. We have reviewed these cases but have chosen not to rely upon them in our analysis and resolution of the issue presented to us. On petition for rehearing, Brutoco cites additional published federal cases (*Dana Corp.* v. *Blue Cross & Blue Shield Mutual of Northern Ohio* (6th Cir. 1990) 900 F.2d 882; *Brownell* v. *State Farm Mutual Ins. Co.* (E.D.Pa. 1991) 757 F.Supp. 526) and an unpublished decision of a federal district court in Illinois (*Washburn* v. *Brown* (N.D.Ill. 1986)). These cases are not really on point and we have rejected their application to the facts before us. The federal and California authorities discussed below are adequate to support the conclusion which we reach.

Cal.App.3d 805, 825 [195 Cal.Rptr. 421].) On review, the appellate court must assume the truth of all facts properly pleaded. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Stockton Newspapers, Inc.* v. *Redevelopment Agency* (1985) 171 Cal.App.3d 95, 99 [214 Cal.Rptr. 561].)

Ordinarily, the review of the trial court's refusal to sustain a demurrer or grant a judgment on the pleadings would be on the abuse of discretion standard and would, in any event, rarely be considered in an application for extraordinary writ relief. (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379].) However, where the issue is tendered, as it is here, on undisputed facts[5] and is purely legal in nature, it calls for the court's independent appellate review (see, e.g., *Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278]) and where the issue raised is one of significant legal import, relief by extraordinary writ is appropriate. (*Babb* v. *Superior Court, supra*, 3 Cal.3d at p. 851; see also, *Omaha Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1266, 1273 [258 Cal.Rptr. 66].) Thus, a pure legal issue of preemption is properly handled by a motion for judgment on the pleadings and its denial is properly reviewed by petition for writ of mandate. (*Commercial Life Ins. Co.* v. *Superior Court* (1988) 47 Cal.3d 473, 476 [253 Cal.Rptr. 682, 764 P.2d 1059].)

As the issue before us has not heretofore been addressed in California, it was appropriate for us to take the unusual step of granting writ review of what is essentially a pretrial pleading matter. (See *Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 908, fn. 2 [221 Cal.Rptr. 575, 710 P.2d 375].) In taking this step we are not unmindful of the significant impact which the availability of a civil RICO claim would have upon California litigation between insurers and insureds given existing California decisional and statutory law.

2. *Summary of Brutoco's Alleged RICO Claim*

Brutoco, by its 10th cause of action, seeks to obtain the very substantial benefits of a civil RICO claim which include not only "threefold the damages" sustained, but also "the cost of the suit, including a reasonable attorney's fee." (18 U.S.C. § 1964 (c).)

RICO is a federal statute which provides both civil and criminal remedies. It prohibits the employment of a pattern of racketeering activity so as to

[5]Brutoco filed no answer or demurrer to the petition (as provided in Cal. Rules of Court, rule 56(e)), but simply a set of points and authorities expressing its opposition to petitioners' request for writ relief. We therefore will deem petitioners' allegations as uncontroverted. (See *Pacific Indem. Co.* v. *Superior Court* (1966) 246 Cal.App.2d 63, 65, fn. 2 [54 Cal.Rptr. 470].)

affect interstate commerce in any of the ways specified in the statute. (See generally, *Sedima, S.P.R.L.* v. *Imrex Co.* (1985) 473 U.S. 479, 484-486 [87 L.Ed.2d 346, 351-353, 105 S.Ct. 3275].) In order to state a civil cause of action under RICO, Brutoco pled that petitioners were a "racketeering enterprise" engaged in a "pattern of racketeering activity." (18 U.S.C. §§ 1961 (5), 1962.)[6] "Racketeering activity" is defined in RICO to include various criminal activities as "predicate acts," including mail and wire fraud, which are federal crimes where the mails or wire, radio or television communications are used to transmit false representations to obtain money or other property. (See 18 U.S.C. § 1961 (1)(B) [defining wire and mail fraud as being one type of a "racketeering activity"]; 18 U.S.C. § 1341 [defining mail fraud and making it a federal crime]; 18 U.S.C. § 1343 [defining wire fraud and making it a federal crime].)

Brutoco further alleged that petitioners had a fraudulent intent never to pay Brutoco the premium refund in accordance with the terms of the workers' compensation policy. In support of the "predicate acts" necessary to invoke RICO civil liability, Brutoco alleged that petitioners had implemented this fraudulent intent or scheme by using the mails to deliver the workers' compensation policy to Brutoco, to accept the premium payments through the mails and by sending letters or making false statements by telephone when the policy issued that the premium refunds would be provided to Brutoco.

Brutoco argues, and the trial court concluded, that it is sufficient to allege the commission of such predicate acts in order to state a valid RICO claim; it makes no difference that the defendant is an insurance company and that the alleged misconduct took place in the context of the sale and performance of a policy of insurance. Petitioners, on the other hand, contend that, by virtue of McCarran-Ferguson, special rules apply to the conduct of the "business of insurance" which effectively permits state law to preempt RICO.

### 3. *The History and Purpose of McCarran-Ferguson*

McCarran-Ferguson sets forth a policy declaration by Congress that it is in the public interest that the primary regulation of the business of insurance be in the states, not in the national government. (15 U.S.C.

[6]In the complaint, Brutoco alleges petitioners are "engaged in activities which affect and constitute interstate commerce" in that they sell "insurance coverage to persons and organizations throughout the United States, including Brutoco." The required "enterprise" allegation asserts that petitioners are "an insurance company engaged in the business of selling insurance."

§ 1011.) It was passed in 1945 in response to a United States Supreme Court decision (*United States* v. *South-Eastern Underwriters Assn.* (1944) 322 U.S. 533 [88 L.Ed. 1440, 64 S.Ct. 1162]) which held that the business of insurance was "commerce" within the meaning of the commerce clause and therefore the business of insurance was subject to all federal laws, including those relating to antitrust. (*Id.*, at p. 553 [88 L.Ed. at pp. 1457-1458].) This was a major change in the law. In 1869 the Supreme Court had held (*Paul* v. *Virginia* (1869) 75 U.S. (8 Wall.) 168, 183 [19 L.Ed. 357, 361]) that insurance was not "commerce" and therefore was not subject to federal commerce clause statutes.

The clear purpose of McCarran-Ferguson was to abrogate this change and to insure that the states would continue to enjoy broad authority in regulating the dealings between insurers and their policyholders. (*Cochran* v. *Paco, Inc.* (5th Cir. 1979) 606 F.2d 460, 463 [51 A.L.R. Fed 731].) As the Supreme Court itself later explained, "The McCarran-Ferguson Act was passed in reaction to this Court's decision in *United States* v. *South-Eastern Underwriters Assn.*, 322 U.S. 533 (1944). Prior to that decision, it had been assumed, in the language of the leading case, that '[i]ssuing a policy of insurance is not a transaction of commerce.' *Paul* v. *Virginia*, 75 U.S. (8 Wall.) 168, 183 [19 L.Ed. 357, 361] (1869). Consequently, regulation of insurance transactions was thought to rest *exclusively* with the States. [Emphasis added.] In *South-Eastern Underwriters*, this Court held that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws, in particular, were applicable to them. Congress reacted quickly. . . . The McCarran-Ferguson Act was the product of this concern. Its purpose was stated quite clearly in its first section; Congress declared that 'the continued regulation and taxation by the several States of the business of insurance is in the public interest.' 59 Stat. 33 (1945), 15 U.S.C. § 1011. . . . [¶] . . . In context, however, it is relatively clear what problems Congress was dealing with. Under the regime of *Paul* v. *Virginia, supra*, States had a free hand in *regulating the dealings between insurers and their policyholders*. Their *negotiations, and the contract which resulted,* were not considered commerce and were, therefore, *left to state regulation.* The *South-Eastern Underwriters* decision threatened the continued supremacy of the States in this area. The McCarran-Ferguson Act was an attempt to turn back the clock, to assure that the *activities of insurance companies in dealing with their policyholders would remain subject to state regulation.*" (*SEC* v. *National Securities, Inc.* (1969) 393 U.S. 453, 458-459 [21 L.Ed.2d 668, 675-676, 89 S.Ct. 564], italics added.)

Thus, there seems little question that Congress, by its passage of McCarran-Ferguson, returned to the states "the plenary power to regulate the

business of insurance that they had enjoyed prior to the *South-Eastern Underwriters* decision. [Fn. omitted.] If Congress intended to invoke its Commerce Clause powers to occupy part of the field of insurance regulation, it would expressly say so." (*Cochran* v. *Paco Inc., supra,* 606 F.2d at p. 463, fn. omitted.)[7]

4. *Analysis Necessary to Application of McCarran-Ferguson*

There is a four-step analysis which must be made to determine if McCarran-Ferguson is to bar the application of a particular federal statute. (*Cochran* v. *Paco, Inc., supra,* 606 F.2d, at p. 464.) In the context of this case, such analysis requires that four questions be considered: (1) Does RICO "specifically relate to the business of insurance" within the meaning of sections 2(a) and 2(b) of McCarran-Ferguson (15 U.S.C. §§ 1012(a) and 1012(b))? If so, then the inquiry is at an end as the statute would come within the exception to McCarran-Ferguson's application; (2) Do petitioners' activities, as alleged in Brutoco's complaint, constitute the business of insurance for purposes of McCarran-Ferguson? (3) If petitioners' activities do constitute the business of insurance, then has California enacted any laws "for the purpose of regulating" such activity? (4) If so, would the application of RICO invalidate, impair or supersede such laws?

Because the first of these questions is answered in the negative and the remaining three in the affirmative, petitioners are entitled to judgment on Brutoco's RICO claim. We discuss each in turn.

a. *RICO Does Not Specifically Relate to the "Business of Insurance"*

McCarran-Ferguson, by its own terms, exempts state law from the supremacy of federal law only when the federal law does not specifically address the insurance business. (*Hanover Ins. Co.* v. *C. I. R.* (1st Cir. 1979) 598 F.2d 1211, 1218, cert. den., 444 U.S. 915 (1979) [62 L.Ed.2d 169, 100

[7]The legislative history of McCarran-Ferguson makes clear that it was Congress's intent that any law relating to interstate commerce (and this obviously includes RICO) which did not specifically relate to insurance would be subject to the provisions of McCarran-Ferguson. As one of the authors of the legislation, Senator Ferguson, put it during Senate debate, "If there is on the books of the United States a legislative act which relates to interstate commerce, if the act does not specifically relate to insurance, it would not apply at the present time. Having passed the bill now before the Senate, if Congress should tomorrow pass a law relating to interstate commerce, and should not specifically apply the law to the business of insurance, it would not be an implied repeal of this bill, and this bill would not be affected because the Congress had not . . . said that the new law specifically applied to insurance. (91 Cong.Rec. 481 (1945)"; *Cochran* v. *Paco, Inc., supra,* 606 F.2d at p. 463, fn. 7.)

S.Ct. 229].) The issue of whether a federal law does or does not specifically address the insurance business is one that is easily resolved by examining the federal statute in question, in this case RICO. Brutoco makes no claim that RICO in any way specifically relates to the business of insurance. It is a general commerce clause statute which provides criminal penalties and civil remedies for defined "racketeering activities." It does not refer to the business of insurance or the insurance industry, and it is clearly not intended to have any special or specific application thereto.[8]

b. *Petitioners' Were Engaged in the Conduct of the Business of Insurance*

The question of just what Congress meant by the phrase "business of insurance" was resolved some time ago by the Supreme Court. In a landmark decision, concluding that the term did not extend to the issuance or sale of securities of insurance companies, the court, in *SEC* v. *National Securities Inc., supra,* put it very succinctly. "Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the 'business of insurance' does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* was all about. The selling and advertising of policies, *FTC* v. *National Casualty Co.* 357 U.S. 560 [2 L.Ed.2d 1540, 78 S.Ct. 1260] (1958), and the licensing of companies and their agents, cf. *Robertson* v. *California,* 328 US 440 [90 L.Ed. 1366, 66 S.Ct. 1160], (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul* v. *Virginia* held was not 'commerce.' *The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.'* Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. *But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are*

[8]As we point out, at least some courts have concluded that the lack of a specific reference to insurance in a federal civil rights law will not automatically bring it within McCarran-Ferguson. (See, e.g., *Spirt* v. *Teachers Ins. & Annuity Ass'n.* (2d Cir. 1982) 691 F.2d 1054, 1063-1067, vacated on other grounds, 463 U.S. 1223 (1983) [77 L.Ed.2d 1406, 103 S.Ct. 3566] (1983), reinstated as modified on other grounds, 735 F.2d 23 (2d Cir. 1984).) However, such a result is not necessarily inconsistent with the express language of McCarran-Ferguson or its legislative history which emphasized that its provisions were intended to apply to federal statutes which related "to interstate commerce."

*laws regulating the 'business of insurance.'* " (393 U.S. at pp. 459-460 [21 L.Ed.2d at p. 675-677], italics added.)

Applying that standard here, we have no trouble concluding that petitioners' alleged conduct, which entirely related to the marketing, sale and performance of a policy of workers' compensation insurance, and representations made in connection therewith, were clearly within the meaning of the term "business of insurance." That such representations were allegedly false and fraudulent does not alter that conclusion. After all, when we consider this issue in the context of determining whether McCarran-Ferguson will give primacy to a state's regulatory laws we cannot forget that such laws are necessarily directed at some form of possible insurance company misconduct which the regulatory statutes exist to prevent or control. If statutes intended to protect or regulate the relationship between insurer or insured are deemed to impact the business of insurance, then certainly the conduct which is alleged to have occurred here, even though wrongful and thus in need of such regulation, must necessarily satisfy the test. It is difficult to imagine conduct which could more closely fit within the concept of the "business of insurance" than the marketing, sale and performance of the policy contract.

Brutoco argues that mail fraud and wire fraud cannot constitute the business of insurance. This argument is a strawman as it serves only to set up Brutoco's main thesis: that McCarran-Ferguson cannot be read to preempt the mail and wire fraud statutes. That conclusion is not disputed, but it simply ignores the real issue, that is, whether petitioners' activities in the marketing, sale and performance of insurance contracts involved them in the "business of insurance." Brutoco's focus on the mail and wire fraud statutes is prompted by the allegations of its complaint that those acts are the criminal predicates for the imposition of civil liability under its RICO claim.

Essentially, Brutoco contends that because its RICO claim includes allegations that fraudulent representations were made by use of the mails, which acts allegedly violated the federal criminal statute, a civil RICO claim which was predicated upon such acts could be pursued. Brutoco argues that since Congress did not intend by the passage of McCarran-Ferguson to restrict or limit its ability to control and punish mail and wire fraud, then state laws may not have primacy over a civil claim which rests upon the commission of those criminal acts. The emptiness of this argument is illustrated by the case cited in its support.

Brutoco relies upon the leading case of *United States* v. *Sylvanus* (7th Cir. 1951) 192 F.2d 96, where, in affirming a criminal conviction of defendants

who had engaged in mail fraud in connection with the sale of accident and sickness insurance policies, the court held that McCarran-Ferguson did not preempt enforcement of the federal mail fraud statute against persons engaged in the insurance field merely because state law regulated that conduct. The court put it, "We conclude, then, it was not the intent of the Congress, by its passage of the McCarran Act, to surrender control of the use of the mails or to cease to authorize the federal courts to determine whether the mails have been utilized in attempted execution of a scheme to defraud and that the district court, by entertaining jurisdiction, did not interfere with regulation of the insurance company by the state but properly overruled the motions to dismiss the indictment." (*Id.*, at p. 100.)

While we obviously agree with Brutoco that McCarran-Ferguson did not represent a congressional intent to surrender control of the use of the mails to the states, we reject the conclusion which Brutoco draws from that obvious fact. *Sylvanus* related to the vindication of federal primacy in the enforcement of its criminal laws; it involved a criminal prosecution for a violation of the mail fraud statute. *Sylvanus* does not support the proposition that a civil RICO claim, which is predicated upon proof that a violation of the mail or wire fraud statutes had occurred, is beyond the reach of McCarran-Ferguson. Brutoco's action has not been brought under the mail or wire fraud statutes. It is a civil action under RICO.[9] *Sylvanus*, upon which Brutoco so heavily relies, related solely to the former and, in our view, is irrelevant to the latter.

This distinction was made clear in the case of *American Hospital & L. Ins. Co.* v. *Federal Trade Com'n* (5th Cir. 1957) 243 F.2d 719. There, the FTC had initiated a civil enforcement proceeding against several insurers who had, in the course of marketing certain health and accident policies, allegedly engaged in false representations. The insurers were charged with distributing "in commerce" false and deceptive advertising in order to solicit purchasers for their policies. As Brutoco does here, the FTC contended that the decision in *Sylvanus* authorized it to proceed with its civil enforcement action. The court of appeals conceded that under *Sylvanus,* McCarran-Ferguson is no bar to a criminal prosecution. "A fraudulent scheme carried on by use of the mails would violate the mail fraud acts even though the mails never crossed a state boundary. The doctrine of the case, with the decision of which we have no disagreement, is of no bearing on the problem before us here. A violation of the postal laws does not of itself confer

[9]As one court put it, ". . . [T]he essence of RICO . . . proscribes the furthering of the [racketeering] enterprise, *not* the predicate acts." (*United States* v. *Martino* (5th Cir. 1981) 648 F.2d 367, 381, italics added.)

jurisdiction on the Federal Trade Commission." (243 F.2d, at p. 724.)[10] The court concluded that *Sylvanus* did not justify the prosecution of a civil enforcement action. The fact that the insurers might be subject to criminal prosecution for violation of the mail fraud statute was not relevant; McCarran-Ferguson precluded a civil remedy under the Federal Trade Commission Act for false representations in the selling of insurance.

*American Hospital*'s conclusion regarding *Sylvanus*'s irrelevance to these facts was echoed in the sixth circuit case of *National Casualty Co.* v. *Federal Trade Com'n* (6th Cir. 1957) 245 F.2d 883, 888. The United States Supreme Court granted certiorari in both cases and affirmed. (*F. T. C.* v. *National Casualty Co.* (1958) 357 U.S. 560, 565 [2 L.Ed.2d 1540, 1543, 78 S.Ct. 1260].) We believe that conclusion is equally applicable here. *Sylvanus*'s affirmance of the primacy of the federal criminal statutes prohibiting mail and wire fraud simply has nothing to do with the question of whether a *civil* RICO claim can be asserted against an insurer for alleged misrepresentations. That such misrepresentations may have been communicated to Brutoco in a manner which violated those statutes may well subject petitioners to criminal prosecution, but not to a civil RICO claim in those states which have enacted laws regulating the business of insurance.

The scope and the impact of McCarran-Ferguson's preservation of the states' right to regulate the business of insurance is illustrated by the cases which consistently have applied its principles, including the four relied upon by Brutoco. In the first of these, *Cochran* v. *Paco, Inc., supra,* 606 F.2d 460, the court held that automobile insurance premium financing by an independent premium finance company did not constitute the business of insurance so as to preclude application of the disclosure requirements of the federal

[10]As petitioners correctly argue in their brief, *Sylvanus* may also be distinguished on constitutional grounds. The criminal mail fraud statute is based on Congress's quite separate constitutional power to establish and regulate the use of the mails (a federal instrumentality and agency) whereas the McCarran-Ferguson Act was primarily intended to address commerce clause statutes. *Sylvanus* so reasoned on this distinction and noted that use of the mails was not a matter regulated by state law. (*Sylvanus, supra,* 192 F.2d at p. 100.) RICO, however, as declared by Congress in its legislative findings supporting its enactment, is a commerce clause statute designed to address the burden on interstate and foreign commerce of racketeering enterprise activities. (*United States* v. *Vignola* (E.D.Pa. 1979) 464 F.Supp. 1091, 1096, affd. 605 F.2d 1199 (1979), cert. den. (1980) 444 U.S. 1072 [62 L.Ed.2d 753, 100 S.Ct. 1015].) McCarran-Ferguson was manifestly intended to reach commerce clause statutes such as RICO and to leave regulation of insurance as "commerce" to the states. (*SEC* v. *National Securities, supra,* 393 U.S. at pp. 459-460.) That may explain the court's reference in *American Hospital* to the fact that use of the mails supports the crime of mail fraud "even though the mails never crossed a state boundary." (*American Hospital, supra,* 243 F.2d, at p. 724.)

Truth in Lending Act. (606 F.2d, at p. 467.)[11] In language not at all helpful to Brutoco, the court said that the key factor in determining the scope of the term business of insurance "is the relationship between the insurer and the insured." The court, in explaining that relationship, emphasized the language used by the Supreme Court in *SEC* v. *National Securities, Inc., supra,* 393 U.S. at page 460 [21 L.Ed.2d at page 676], where the focus was placed on "the type of policy which could be issued, [and] its reliability, interpretation and enforcement." The court concluded that these elements of the insurer-insured relationship are simply not affected "to any significant extent by premium financing arrangements." (*Cochran* v. *Paco, Inc., supra,* 606 F.2d at p. 466.)

Similarly, *United States* v. *Meade* (S.D.Ind. 1960) 179 F.Supp. 868 provides Brutoco with little assistance. It simply holds that an insurance agency corporation (including its promoters) which issued and sold stock was subject to criminal prosecution under the Securities Act of 1933. (179 F.Supp. at p. 874.) That the proceeds of such stock sales were invested in an insurance company which then issued health and accident policies sold by the agency corporation did not implicate McCarran-Ferguson. Such activity was not the "business of insurance"; it did not involve the insurer-insured relationship. Indeed, the defendants in this case were in no different position from that of any other investor in the stock of an insurance company. (*Id.*, at p. 876.) In any event, as *Sylvanus* made clear, McCarran-Ferguson is no bar to the general application of United States criminal jurisdiction, even to persons engaged in the business of insurance.

Next, in *Women in City Govern. United* v. *City of New York* (S.D.N.Y. 1981) 515 F.Supp. 295, the court held that the City of New York and the Governing Board of its retirement system were subject, in spite of McCarran-Ferguson, to actions under title VII of the Civil Rights Act of 1964 (tit. VII, 42 U.S.C. § 2000e et seq.) for gender discrimination in providing lesser pension or group benefits to women. (515 F.Supp. at p. 306.) The court held that Congress did not intend that McCarran-Ferguson be a limitation on its power to enact civil rights legislation that might incidentally affect the business of insurance. (See fn. 8, *ante.*) As the court put it, "[McCarran-Ferguson] should not be applied indiscriminately to subsequent federal legislation, *the overriding purpose of which is not the regulation of commerce but the protection of other important federal interests,* solely because that

[11]We note in passing, however, that not all cases have reached the same result on this issue. At least two other courts have concluded that insurance companies or insurance brokers that provide premium installment or financing arrangements are not subject to the Truth in Lending Act because of McCarran-Ferguson. (See *Lowe* v. *AARCO-American, Inc.* (7th Cir. 1976) 536 F.2d 1160, 1162; *Gerlach* v. *Allstate Insurance Company* (S.D.Fla. 1972) 338 F.Supp. 642, 649-650.)

legislation fails to specifically to state that it is applicable in circumstances where insurance interests are implicated." (*Id.*, at p. 303, italics added.) Brutoco argues that Congress's intent to control racketeering enterprises justifies elevation of RICO to the status of civil rights laws. We reject this as facile. Apart from the fact that RICO is clearly legislation regulating interstate commerce, that argument could as easily be applied to any legislation which Congress thought enough of to enact. Such a result would totally undermine the explicit language and stated legislative purpose of McCarran-Ferguson. While we have no quarrel with a judicial reduction of McCarran-Ferguson's potential scope based upon the paramount importance of protecting constitutional rights, we see no reason to extend that principle here as Brutoco asks us to do. Congress could easily have made RICO applicable to insurance business activities but refrained from doing so.

Finally, in *Hewlett-Packard Co.* v. *Barnes* (9th Cir. 1978) 571 F.2d 502, the court held that McCarran-Ferguson does not prevent preemption by The Employee Retirement Income Security Act of 1974 (ERISA) of a state statute relating to employee health benefit plans. Not only did Congress make it unmistakably clear that ERISA was intended to preempt all state laws that directly regulated employee benefit plans (*Id.* at p. 504),[12] but here the critical factor was not that ERISA had nothing to do with the business of insurance but rather that it did. ERISA falls within the exception contained in section 2(b) of McCarran-Ferguson (15 U.S.C. § 1012(b)), as it "specifically relates to the business of insurance." (571 F.2d at p. 505.)

c. *California Has a Comprehensive Statutory Scheme Enacted for the Purpose of Regulating the Business of Insurance*

California has enacted comprehensive legislation expressly designed to regulate the business of insurance. Indeed, it was initially enacted in 1959[13] in direct response to McCarran-Ferguson. That legislation[14] expressly includes as a prohibited act the very conduct which is asserted here by Brutoco

[12]Also, ERISA itself provides in the "deemer clause" (29 U.S.C. § 1144(b)(2)(B)), that employee benefit plans may not be deemed to be in the business of insurance for purposes of state law. (*Hewlett-Packard Co.* v. *Barnes, supra*, 571 F.2d at p. 505.)

[13]The Unfair Trade Practices Act was added by Statutes 1959 and provides, in its very first section:

"The purpose of this article is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945 [McCarran-Ferguson, 15 U.S.C. § 1011 et seq.], by defining, or providing for the determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." (Ins. Code, § 790.)

[14]In addition, as we point out below, California has also enacted specific statutory provisions which are directly related to workers' compensation insurance, which is the type of insurance involved in this case.

as the basis for its RICO claim.[15] However, it does not provide for a private right of action, but rather only administrative remedies. (*Moradi-Shalal* v. *Fireman's Fund Ins. Cos.* (1988) 46 Cal.3d 287, 304-305 [250 Cal.Rptr. 116, 758 P.2d 58]; *Tricor California, Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 880, 882-883, 885-888 [269 Cal.Rptr. 642].)

California has also specifically undertaken extensive legislative control and regulation of workers' compensation insurance rates, including premium refunds and dividends. (Ins. Code, §§ 11730-11745; see also, *State Comp. Ins. Fund* v. *McConnell* (1956) 46 Cal.2d 330, 335-340 [294 P.2d 440].) These statutory provisions regulate such matters as the (1) classification of risks and premium rates, (2) factors which will determine or limit premium refunds, discounts or participatory dividends and (3) establishment of minimum premium rates and merit rating (i.e., "schedule" rating or "experience" rating) systems. Each of these issues are involved in Brutoco's claims and certainly are at the very heart of the "business of insurance" as that term has been repeatedly defined and applied.

We are aware that at least one federal case has concluded that a portion of California's legislative scheme (Ins. Code, § 790.03, subd. (h)) does not meet the criteria for describing a state law "which regulates insurance." (See *Roberson* v. *Equitable Life Assur. Soc. of U.S.* (C.D.Cal. 1987) 661 F.Supp. 416, 421-424.) However, in applying the relevant factors, we reach a different conclusion as to the regulatory statutes before us.

"Cases interpreting the scope of the McCarran-Ferguson Act have identified three criteria relevant to determining whether a particular practice

---

[15] Insurance Code section 790.03 provides in relevant part:

"The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:

"(a) Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon, or making any false or misleading statement as to the dividends or share of surplus previously paid on similar policies, or making any misleading representation or any misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates, or using any name or title of any policy or class of policies misrepresenting the true nature thereof, or making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his or her insurance.

"(b) Making or disseminating or causing to be made or disseminated before the public in this state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatsoever, any statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his or her insurance business, which is untrue, deceptive, or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue, deceptive, or misleading."

falls within that Act's reference to the 'business of insurance': *first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry. [Citations.]" (*Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 743 [85 L.Ed.2d 728, 742-743, 105 S.Ct. 2380]; see also *Pilot Life Ins. Co.* v. *Dedeaux* (1987) 481 U.S. 41, 48-49 [95 L.Ed.2d 39, 48-49, 107 S.Ct. 1549].)

Application of these criteria suggests that California's legislation satisfies at least two of them.[16] With respect to the first factor, it is certainly arguable that the regulatory provisions of the Unfair Trade Practices Act (Ins. Code, § 790 et seq.) do not limit or modify the risk assumed either by the insurer or the insured.[17] The spreading of the risk in this context allows "the insurer to accept each risk at a slight fraction of the possible liability on it." (*Union Labor Life Ins. Co.* v. *Pireno* (1982) 458 U.S. 119, 127, fn. 7 [73 L.Ed.2d 647, 655, 102 S.Ct. 3002].) We do not seriously quarrel with the conclusion that the regulatory provisions of the Unfair Trade Practices Act have little impact on the spreading or transferring of policyholder risk. However, we have no doubt that California's insurance laws satisfy the remaining two factors.

The California legislation certainly affects an integral part of the policy relationship and necessarily involves not only the type of policy which could be issued but also its "reliability, interpretation and *enforcement.*" (*SEC* v. *National Securities Inc., supra,* 393 U.S. at p. 460 [21 L.Ed.2d at p. 676], italics added.) "[W]hatever the exact scope of the statutory term ['business of insurance'], it is clear where the focus [of Congress] was—it was on the relationship between the insurance company and the policyholder. *Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the 'business of insurance.'* " (*Id.,* at p. 460 [21 L.Ed.2d at p. 676], italics added.) The California statutes under review here relate directly to the control and prevention of the very deceptive acts of which Brutoco complains. Moreover, in our view, nothing could be more central to the insurer-insured relationship than regulating this sort of misconduct.

[16]The *Roberson* court concluded that only one of the criteria (the third) was satisfied by section 790.03, subdivision (h). We particularly disagree with that court's view regarding the application of the second criterion and we reach a different conclusion.

[17]In this particular case, however, even this criterion is probably satisfied by the specific statutes enacted to control rate setting, classification of risks and premiums and methods for establishing premium refunds, discounts and participating dividends in the area of workers' compensation insurance. (Ins. Code, §§ 11730-11745.)

The final criterion is obviously met. The Unfair Trade Practices Act is not only directed expressly and solely to the insurance industry; it was originally enacted in 1959 for the specific purpose of regulating that industry and as a direct and acknowledged result of the passage of McCarran-Ferguson.

While it is true that, "None of these criteria is necessarily determinative in itself" (*Union Labor Life Ins. Co.* v. *Pireno, supra,* 458 U.S. at p. 129 [73 L.Ed.2d at p. 656]) and "[n]o one factor is dispositive; rather each is instructive" (*United Food and Commercial Workers* v. *Pacyga* (9th Cir. 1986) 801 F.2d 1157, 1161 [holding that an Arizona law did not regulate insurance where only one of the three factors was present]), we are satisfied that the California legislation which impacts or relates to the conduct of petitioners described in Brutoco's complaint regulates the "business of insurance."

We therefore conclude that California's comprehensive legislative scheme (Ins. Code, § 790 et seq.) was intended to and does indeed regulate the "business of insurance" within the meaning of McCarran-Ferguson. We are not deterred in reaching that conclusion by the debatable proposition that the first criterion is not satisfied.[18] (Cf. *Lee* v. *Prudential Ins. Co. of America* (N.D.Cal. 1987) 673 F.Supp. 998, 1000-1001.)

d. *To Apply RICO Here Would Invalidate, Impair and Supersede California's Comprehensive Statutory Scheme for Regulation of the Insurance Industry*

Allowance of a RICO action seeking civil damages (including treble damages and attorneys fees) for the very conduct which California has chosen to regulate administratively would subvert and subsume the existing statutory scheme. It would permit a civil damage recovery where our Supreme Court has recently and explicitly held that none was intended.

[18]In *Commercial Life Ins. Co.* v. *Superior Court, supra,* 47 Cal.3d 473, 479-483, our Supreme Court discussed this issue in a different context (impact of the "saving clause" of ERISA on the question of ERISA preemption of Ins. Code, § 790.03, subd. (h)), but did not reach a conclusion. It reviewed without criticism *Roberson* v. *Equitable Life Assur. Soc. of U.S., supra,* and *Kanne* v. *Connecticut General Life Ins. Co.* (9th Cir. 1988) 859 F.2d 96, which had stated its general agreement with *Roberson.* However, both *Kanne* and *Commercial Life* reached the conclusion that ERISA would preempt section 790.03, subdivision (h), "even if it were found to be within the scope of the savings clause as a law regulating insurance. This conclusion is compelled by the Supreme Court's discussion [in *Pilot Life*] of congressional intent [in its enactment of ERISA], which the court cited as the most significant factor in its determination. [Citation.]" (*Commercial Life Ins. Co.* v. *Superior Court, supra,* 47 Cal.3d at p. 483.)

(*Moradi-Shalal* v. *Firemen's Fund Ins. Cos., supra,* 46 Cal.3d at pp. 304-305.) This would not be the first time that creative litigation efforts had been unsuccessfully expended to get around that decision. (See, e.g., *Maler* v. *Superior Court* (1990) 220 Cal.App.3d 1592 [270 Cal.Rptr. 222], where we held that a statutory bad faith claim for damages could not be recast as unfair competition and prosecuted under Bus. & Prof. Code, § 17200 et seq.)

## CONCLUSION

From our examination of this record and the applicable law we conclude that (1) RICO does not "specifically relate to the business of insurance" and therefore does not come within the exception set out in McCarran-Ferguson's section 2(b) (15 U.S.C. § 1012(b)), (2) the alleged acts of petitioners took place in the context of their conduct of the business of insurance, (3) California's extensive insurance legislation was enacted to control and prevent just such activities and, indeed, was a direct and specific response to McCarran-Ferguson and (4) the application of RICO would clearly "invalidate, impair and supersede" California's statutory and decisional law regulating the business of insurance.

Therefore, California law preempts the application of RICO in this case. Brutoco's remedies for the alleged misrepresentations must be limited to those administrative proceedings authorized under the Unfair Trade Practices Act or to its remaining common law actions, including those for breach of contract and fraud. The trial court should therefore have granted petitioners' motion for judgment on the pleadings as to Brutoco's tenth cause of action.

## DISPOSITION

The alternative writ is discharged. A peremptory writ shall issue directing the trial court to vacate its order denying petitioners' motion for judgment on the pleadings as to the 10th cause of action of the complaint and to enter a new and different order granting the same.

Klein, P. J., and Hinz, J., concurred.

A petition for a rehearing was denied October 25, 1991, and the petition of real party in interest for review by the Supreme Court was denied December 12, 1991.