Brooks GORDON, on behalf of himself
and of all others similarly
situated, Plaintiff,

v.

FORD MOTOR CREDIT COMPANY, a
Delaware Corporation, Defendant.

No. C–91–4477 RFP.

United States District Court,
N.D. California.

Aug. 20, 1992.

Barry Baskin, Robert M. Bramson, and
Mark A. Chavez, Farrow, Schildhause & Wilson, Walnut Creek, CA.

M. Laurence Popofsky, Peter S. Hecker,
and Brent D. Seymour, Heller Ehrman
White & McAuliffe, San Francisco, CA.

## ORDER

PECKHAM, District Judge.

Defendant Ford Motor Credit Company
("FMCC"), an automobile financing company,
requires that its customers purchase collision
and comprehensive insurance on vehicles financed by FMCC. When FMCC's customers fail to provide such insurance, the financing agreement entities FMCC to protect its
security interest in the financed vehicles by
purchasing collateral protection for the vehicles. FMCC purchases this collateral insurance from the American Road Insurance
Company ("TARIC"), a related corporation,
and transfers those costs to those customers
who have failed to provide the contractually
requisite insurance.[1]

Plaintiff in this purported class action challenges FMCC's practices related to collateral

---

1. A closely-related class action has been filed in
California state court alleging violations of the
California Business and Professions Code and
the California Consumer Legal Remedies Act as
well as various common law causes of action.

protection insurance alleging that FMCC violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., by virtue of the manner in which it explained, procured, placed and charged for collateral protection insurance. More concretely, plaintiff claims that FMCC fraudulently charged him amounts in excess of the true sum attributable to FMCC's acquisition of collision and comprehensive insurance to protect its security interest in Mr. Gordon's vehicle.

FMCC now brings a Motion to Dismiss under Federal Rules of Civil Procedure ("F.R.C.P.") 12(b)(6) on two alternative bases: first, that the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1012 (1945) ("Act"), leaves the subject matter of this Complaint to the regulation of the states and; second, that the Complaint fails to allege each element required to support a civil RICO action.

## DISCUSSION

■ The McCarran–Ferguson Act (the "Act") leaves regulation of the "business of insurance" to individual states unless Congress enacts legislation which specifically relates to the "business of insurance." In applying the Act, courts have articulated a four-step procedure for determining whether the Act precludes application of a particular federal statute to a challenged activity or practice. First, courts must ask whether the federal statute being applied specifically relates to insurance. If not, courts must determine whether the practice in question consti-

tutes the "business of insurance." If so, courts must then determine whether the state in question has enacted laws regulating the activities being challenged. Finally, if such state legislation exists, courts must decide whether the application of the federal statute would "invalidate, impair or supersede" the applicable state law. Cochran v. Paco, Inc., 606 F.2d 460, 464 (5th Cir.1979).

Plaintiff opposes the Motion to Dismiss by arguing that the practices challenged in this action do not fall within the scope of the exemption for three reasons. First, he suggests that the exemption under the Act applies only to insurance companies and, therefore, does not extend to defendant, an automobile financing company in this case. Second, plaintiff argues that the activities and practices alleged in the Complaint do not constitute the "business of insurance." [2] Third, he argues that the application of RICO under these circumstances would not "invalidate, impair or supersede" applicable state law. These arguments are addressed below.[3]

### A. FMCC's Status Under the Act

■ Plaintiff argues that the Act applies only to insurance companies, a category to which FMCC does not belong. Defendant counters that the Act exempts any activity or practice that constitutes the business of insurance independent of the entity conducting that activity or practice. Neither the Supreme Court nor the Ninth Circuit has ad-

---

**2.** The Complaint charges that:
FMCC requires its borrowers to maintain collision and comprehensive insurance coverage ... on financed vehicles. If FMCC believes a borrower has failed to purchase or maintain such insurance, it procures and "force-places" insurance, billing the borrower for the premium charge. However, unbeknownst to the borrower, FMCC procures and charges the borrower for insurance coverages in addition to collision and comprehensive insurance which benefit FMCC. The material facts relating to the purchase of these additional coverages are concealed from borrowers. FMCC does not inform borrowers of the existence of, the terms of, or the premium charges attributable to the additional insurance coverages. Nor does FMCC disclose to borrowers that it is procuring the insurance from its subsidiary at inflated rates set by FMCC.

At all relevant times alleged herein, FMCC has been engaged in a fraudulent scheme, violative of the Racketeering Influenced and Corrupt Organizations Act ... designed to increase the revenues and profits it receives from its force-placed insurance program, to the economic detriment of its borrowers.
Class Action Complaint, at 1–2.

**3.** In analyzing a Motion to Dismiss, this court must construe the allegations of the Complaint in the light most favorable to the plaintiff. NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir.1986). This court must assume that plaintiff's allegations are true and resolve any doubt in plaintiff's favor. Sun Savings & Loan Assoc. v. Dierdorff, 825 F.2d 187, 191 (9th Cir.1987); United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir.1981).

dressed the applicability of the Act to non-insurer defendants.[4] Resolution of this dispute requires delving into the history and purposes of the Act.

The Act rests on the premise that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 59 Stat. 33 (1945), 15 U.S.C. § 1011. To promote this premise, the Act leaves regulation of the business of insurance to individual states and bars application of federal legislation in this area except where Congress enacts legislation specifically related to insurance. In this way, the Act embodies a congressional commitment to return to the states the plenary power to regulate insurance that they had enjoyed prior to *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

This view of the policies underlying the Act logically corresponds to an interest in the activities or practices of the insurance industry rather than a concern with the status of insurance companies. *Securities & Exchange Commission v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) ("*National Securities* "). In fact, the *National Securities* Court defined the scope of the Act relative to insurance-related activities rather than relative to labels placed on the parties in a particular action:

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—on the relationship

between the insurance company and the policyholder.

*Id.,* 393 U.S. at 459–60, 89 S.Ct. at 568–69. *National Securities* expressly deemphasized the parties involved and the labels placed on them:

> The statute did not purport to make the States supreme in regulating all activities of insurance companies; its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply.

*Id.,* 393 U.S. at 459–60, 89 S.Ct. at 568.

In *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 133, 102 S.Ct. 3002, 3010, 73 L.Ed.2d 647 (1982), the Supreme Court translated this concern into an *assumption* that a non-insurer defendant could invoke the Act. While the Court did not apply the McCarran–Ferguson exemption to the arrangements complained of in the action, it expressly assumed that a non-insurer's involvement in alleged violations of federal law does not necessarily defeat antitrust exemption:

> We may assume that the challenged peer review practices need not be denied the § 2(b) exemption *solely* because they involve parties outside the insurance industry. . . . [T]he involvement of such parties, even if not dispositive, constitutes part of the inquiry . . .

*Id.,* 458 U.S. at 133, 102 S.Ct. at 3011.[5] This language suggests that the presence of such parties matters only insofar as it throws light on the nature of the activity or practice challenged.

---

**4.** In fact, only two circuits have done so. The Seventh Circuit has applied the Act to a non-insurer defendant, see *Lowe v. Aarco–American, Inc.,* 536 F.2d 1160 (7th Cir.1976) (per curiam), while the Fifth Circuit expressly limited the scope of the Act to insurance companies, see *Cochran v. Paco, Inc.,* 606 F.2d 460 (5th Cir. 1979).

**5.** The Court refused to apply the exemption on the grounds that the arrangements challenged

"can hardly be said to lie at the center of the legislative concern [with anti-trust issues]" and the grounds that the arrangements challenged have the potential to restrain competition in non-insurance markets. 458 U.S. at 133, 102 S.Ct. at 3010. This language clearly demonstrates the Supreme Court's attention to the nature of the practice, not the party.

Following *Pireno*, the Ninth Circuit determined that the application of the Act should be based on the nature of the activities or practices alleged in a given action. *See, e.g., Feinstein v. Nettleship Co. of Los Angeles,* 714 F.2d 928, 932 (1983) (holding that *Pireno* is satisfied where "the only role of the non-insurer is in negotiating the terms of the policy relationship between insurer and insured, and the *gravamen of the complaint* is in the insurance market itself") (emphasis added); *Klamath–Lake Pharmaceutical Ass'n v. Klamath Medical Serv. Bureau,* 701 F.2d 1276, 1286 (9th Cir.) *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983) (holding that "[i]t is the business of insurance, not merely the business of traditional insurers, that activates the exemption"); *United States v. Title Insurance Rating Bureau of Ariz. Inc.,* 700 F.2d 1247, 1252 (9th Cir.1983), *cert. denied,* 467 U.S. 1240, 104 S.Ct. 3509, 82 L.Ed.2d 819 (1984) (focusing on "the nature of the activity itself, not the type of business that is conducting it ...").

For these reasons, this court refuses to adopt plaintiff's invitation to limit the McCarran–Ferguson exemption to traditional insurers. Instead, this court adopts the focus; evident in the McCarran–Ferguson analysis of the Supreme Court and of this Circuit, on the nature of the challenged practice rather than the label placed on the defendant.

### B. The Nature of the Practices Challenged

#### 1. The Business of Insurance

■ To apply the Act, this court must determine whether the practices charged in the Complaint constitute the "business of insurance"—the term employed by the Act to delimit the scope of the exemption. This inquiry is governed by *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ("*Royal Drug* "), which defined the "business of insurance" in the context of reviewing an agreement between health insurers and non-insurer third party providers (pharmacies).[6] In *Royal Drug,* the Supreme Court identified three characteristics relevant to determining whether particular practices fall within the scope of the term:

first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the industry.

*Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009 (summarizing *Royal Drug* ).[7] Courts have adapted application of the *Royal Drug* factors to actions involving an insurance activity connected to a non-insurance activity, such as the automobile financing scheme present here. In this type of action, courts must look to the gravamen of the Complaint to apply the *Royal Drug* factors. *Addrisi v. Equitable Life Assur. Soc. of U.S.,* 503 F.2d 725 (9th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975).

#### 2. The Gravamen of the Complaint

To perceive the gravamen of the Complaint in this action, this court must choose between the competing characterizations of the Complaint advanced by FMCC and by

---

**6.** Without expressly defining this term, National Securities highlighted "the relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement" as the core of the "business of insurance." 393 U.S. at 459–60, 89 S.Ct. at 568.

**7.** The Royal Drug factors were designed to promote the Act's underlying policies of (1) protecting state regulation of the business of insurance and (2) creating a partial antitrust immunity for the business of insurance. For this reason, courts should consider legislative intent in applying the Royal Drug factors. E.g., *Pireno,* 458 U.S. at 133, 102 S.Ct. at 3011 (not exempting arrangement at issue on the grounds that it could

"hardly be said to lie at the center of th[e] legislative concern [underlying the Act]").

Courts have held that the term should be construed as narrowly as possible to best promote statutory policies. *Anglin v. Blue Shield of Virginia,* 693 F.2d 315, 320 (4th Cir.1982) ("it is readily apparent that the courts, including this one, have often given a narrow interpretation to the term [business of insurance]"); *Duane v. Government Employees Ins. Co.,* 784 F.Supp. 1209, 1220 (D.Md.1992) ("[w]hen considering the effect of the McCarran–Ferguson Act, courts have concluded with near uniformity that the preemptive reach of the Act must be narrowly construed").

plaintiff. According to defendant, the Complaint challenges FMCC's collateral protection *insurance* practices—an area delegated by Congress to regulation by individual states. Plaintiff disputes this characterization of the Complaint suggesting that it targets the fraudulent *commercial* practice of overcharging for amounts in excess of the true sum attributable to FMCC's acquisition of collision and comprehensive insurance.[8] Thus, recourse to the McCarran–Ferguson exemption turns on the choice between plaintiff's characterization of the Complaint as one rooted in commercial misrepresentation and defendant's characterization of the Complaint as focusing on the collision and comprehensive insurance practices of FMCC.[9]

While the language of the Complaint emphasizes the commercial aspects of the alleged scheme, the Complaint focuses on the forced-placement and sale of insurance policies. First, the Complaint charges that FMCC set "inflated" insurance rates.[10] Thus, the Complaint suggests impropriety in the insurance rates set—an irregularity intimately tied to regulation of insurance and squarely under the California Insurance Code. "Certainly, the fixing of rates is part of this business [of insurance]." *American Int'l Group, Inc. v. Superior Court,* 234 Cal. App.3d 749, 759, 285 Cal.Rptr. 765 (1991), *cert. denied, sub nom., Brutoco Engineering & Construction v. American Int'l Group, Inc.,* —— U.S. ——, 112 S.Ct. 1944, 118 L.Ed.2d 549 (citing *National Securities* ).

Second, the Complaint details misrepresentations in the terms and procurement of collateral protection insurance. In this connection, the Complaint suggests that FMCC misleads its clients regarding the coverages purchased by FMCC and their terms:

... FMCC procures and charges the borrower for insurance *coverages* in addition to collision and comprehensive insurance which benefit FMCC. The material facts relating to the purchase of these additional coverages are concealed from borrowers. FMCC does not inform borrowers of *the existence of, the terms of, or the premium charges* attributable to the additional insurance coverages.

Class Action Complaint at 1–2 (emphasis added). In this way, the Complaint suggests that defendant misrepresents not only the price of collision and comprehensive coverage, but also the type of coverages purchased under the financing agreement and their terms. These allegations are not incidental to the insurance practices of FMCC and TARIC; they are firmly rooted in the collateral protection insurance practices of FMCC and, therefore, can be said to constitute the "business of insurance." *See, e.g., Senich v. Transamerica Premier Ins. Co.,* 766 F.Supp. 339 (W.D.Penn.1990) (holding that procurement of, placement of, and rates for collateral protection insurance constitute business of insurance). To hold otherwise would suggest that any allegation of fraud connected to the insurance industry would be exempted from the Act.

### 3. Application of the *Royal Drug* Factors

This conclusion is supported by application of the *Royal Drug* factors. First, *Royal Drug* directs courts to determine whether the alleged practice has the effect of transferring or spreading a policyholder's risk. In this connection, the purpose and effect of the alleged fraud is the distribution of risk from by shifting the costs of undisclosed insurance policies to FMCC's clients. In this light, it is

---

**8.** Plaintiff argues that the Complaint challenges only FMCC's misrepresentations regarding the amounts which plaintiff owed to FMCC under the finance contract. Plaintiff also suggests that the proceeds of the alleged fraud went *incidentally* to purchasing insurance just as they might have gone to any other purpose. Finally, he claims that FMCC acted on its own behalf in purchasing the insurance and thus did not act as an intermediary or quasi-insurance agent. Thus, according to plaintiff, the Complaint does not implicate the terms, rates and coverages of the insurance obtained from TARIC.

**9.** See note 2, supra, for the allegations made in the Complaint.

**10.** "Nor does FMCC disclose to borrowers that it is procuring the insurance from its subsidiary at *inflated rates set by FMCC."* Class Action Complaint, at 1–2. While this language appears to allege only nondisclosure, it clearly implicates the fixing of rates.

apparent that reallocation of risk is at the root of the alleged scheme.

Moreover, the Complaint charges that defendant forwards a certificate of insurance to recipients of the force-placed insurance. According to plaintiff, this certificate leads FMCC's customers to believe that the policy issued by TARIC covers only collision and comprehensive insurance when in reality undisclosed coverages are included.[11] Thus, this alleged misrepresentation may influence clients of FMCC to procure on their own behalf collateral insurance protection which, unbeknownst to them, may be redundant with the undisclosed coverages. In this way, the alleged misrepresentation would further affect the distribution of risk.

Second, *Royal Drug* requires courts to ask whether the alleged practice constitutes an integral part of the policy relationship between the insurer and the insured. This action concerns the unauthorized purchase of insurance policies from a third-party insurer—a practice which actually *creates and defines* the policy relationship between insurer and insured. Most importantly, this practice conceals from FMCC's clients knowledge of the very existence of the insurance relationship created by the alleged additional coverages.[12]

Third, *Royal Drug* asks whether the alleged practice is limited to entities within the insurance industry. In this case, the defendant is charged with a practice which lies at the intersection of automobile financing and collateral protection insurance. In this sense, the alleged practice is simultaneously within and beyond the industry. However, for the purposes of deciding this Motion, this

court notes that insurance is fundamental both to the means of securing the allegedly fraudulent revenues (misrepresentations regarding insurance rates and coverages) and to the use to which these revenues are put (purchasing undisclosed insurance policies).[13] Moreover, plaintiff alleges a scheme in which FMCC may, in a sense, be characterized as being the insured party which force-places collateral protection insurance to protect its own security interest. In these senses, the practice alleged in the Complaint is limited to the insurance industry and the third prong of *Royal Drug* is satisfied.

For these reasons, this court holds that the practices alleged in the Complaint constitute the business of insurance.

### C. State Regulation and the Application of State Law [14]

■ "California has enacted comprehensive legislation expressly designed to regulate the business of insurance." *American Int'l Group, Inc. v. Superior Court,* 234 Cal. App.3d 749, 764, 285 Cal.Rptr. 765 (1991), *cert. denied, sub nom., Brutoco Engineering & Construction v. American Int'l Group, Inc.,* —— U.S. ——, 112 S.Ct. 1944, 118 L.Ed.2d 549 ("*AIG*"); *see also, Feinstein,* 714 F.2d at 933. The California Insurance Code forbids insurers, agents, brokers and all others engaged in the business of insurance from misrepresenting the terms, benefits or advantages of insurance policies. Cal. Ins.Code §§ 790.01–03. Investigatory and enforcement authority for violations of the Code have been delegated to the commissioner of insurance. *Feinstein,* 714 F.2d at 933;

---

**11.** In fact, under plaintiff's version of the facts, this certificate would be a fraudulent and incomplete symbol.

**12.** Whether or not FMCC's clients are technically the insured, they are effectively the purchasers of the undisclosed collateral policies. Finally, this court's analysis would not differ were it to consider FMCC to act as an intermediary or agent of TARIC. We focus not on the labels placed on the parties, but on the nature of the relationship involved which, in this case, implicates the most fundamental aspects of the relationship between insurer and insured.

**13.** While FMCC could have acquired funds for purchasing the undisclosed policies by misrepre-

senting charges unrelated to insurance, the Complaint before this court alleges that revenues were generated by misrepresentations regarding the rates and coverages of automobile insurance policies.

**14.** As discussed above, this court must determine whether California has enacted laws regulating the activities being challenged in this action and, if such state legislation exists, this court must decide whether the application of RICO would "invalidate, impair or supersede" the applicable state law. *Cochran v. Paco, Inc.,* 606 F.2d 460, 464 (5th Cir.1979).

*AIG*, 234 Cal.App.3d at 767–68, 285 Cal.Rptr. 765. Thus, this court finds that California has enacted laws regulating the activities being challenged. Furthermore, given California's extensive regulation of the insurance industry, this court concludes that application of RICO would impair, invalidate, and supersede the body of substantive laws which California has enacted to govern insurance practices in this state.

### CONCLUSION

Having ruled that the McCarran–Ferguson exemption applies to the defendant and to the practices alleged in the Complaint, defendant's Motion to Dismiss is hereby GRANTED.

IT IS SO ORDERED.